T.F.W. MANAGEMENT, INC. and
Timothy F. Williams,
Appellants,

v.

WESTWOOD SHORES PROPERTY
OWNERS ASSOCIATION,
Appellee.

No. 14–03–01358–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 9, 2004.

Rehearing En Banc Overruled
April 28, 2005.

J. Bennett White, Adam Allen, Tyler, for appellants.

Charles A. Daughtry, James H. Leeland, Patrick Sullivan, Houston, for appellee.

Panel consists of Justices FOWLER, EDELMAN, and SEYMORE.

## MAJORITY OPINION

WANDA McKEE FOWLER, Justice.

T.F.W. Management, Inc. ("TFW") filed this accelerated appeal to protest a temporary injunction granted to the Westwood Shores Property Owners Association ("the Association"). TFW argues the trial court abused its discretion in granting the temporary injunction because (1) the evidence demonstrated TFW did not breach its contract with the Association, (2) the trial court misinterpreted the contract, (3) the trial court impermissibly granted specific performance, (4) the trial court lacked authority to alter the terms of the contract, (5) equity favors TFW, and (6) the Association was unable to show a probable injury. We hold that the trial court abused its discretion because the trial court misinterpreted the contract and we do not reach TFW's alternate arguments. Finding that a new water rate implemented by the Trinity River Authority was substantially different that the rate TFW agreed to pay, we reverse the trial court's order granting the temporary injunction.

## FACTUAL AND PROCEDURAL BACKGROUND

In 1972, BRL Joint Venture, later known as Westwood Shores, Inc. ("the Developer"), developed nineteen subdivisions collectively known as Westwood Shores. The subdivisions were centered around the Westwood Shores Country Club, which included a golf course and other amenities.

On October 31, 1996, the Developer sold the Westwood Shores Country Club to TFW. In conjunction with the sale, the Developer executed a Deed Without Warranty ("the Deed") conveying Westwood Lake to the Association, and an Assignment of Water Rights ("the Assignment") assigning TFW an easement right in use of water from the lake. The Deed provided that:

[The Association] acknowledges that Grantor's reservation of water rights could possibly result in the availability of little or no water within Westwood Lake for purposes other than those benefiting the property commonly referred to as Westwood Shores Country Club, and [the Association] agrees to accept this conveyance subject to and burdened by such reservation of water rights. However, [TFW] shall have the duty and obligation to maintain the water at a sufficient level so that Members of [the Association] may also enjoy the benefits of Westwood Lake for aesthetic and recreational purposes so long as water sufficient for these purposes is reasonably available from Trinity River Authority of Texas under terms substantially similar to those contained within the Limited Raw Water Sales Agreement from Reservoir, by and between [the Developer] and the Trinity River Authority in effect

as of the date of this Deed Without Warranty, with adjustments for inflation.

The Assignment similarly provided that:

TFW shall have the duty and obligation to maintain the water [within Westwood Lake] at a sufficient level so that Association members may also enjoy the benefits of Westwood Lake for aesthetic and recreational purposes so long as water suitable for these purposes is reasonably available from Trinity River Authority of Texas under terms substantially similar to those contained within the Limited Raw Water Sales Agreement From Reservoir, between [the Developer], and Trinity River Authority in effect as of the date of this Assignment of Water Rights, with adjustments for inflation.

In 1997, TFW and the Trinity River Authority entered into a Limited Raw Water Sales Agreement From Reservoir (the "Sales Agreement") substantially similar to the one referenced in the Deed and the Assignment. The Sales Agreement provided that TFW was to pay the Trinity River Authority a minimum annual charge of $1551, and that TFW would be able to divert up to 470 acre-feet of water. TFW could also divert additional water, at a rate of $3.30 per acre-foot.

But, in December of 1999, the Trinity River Authority implemented new, greatly increased water rates. The rate was increased to $35 per acre-foot effective December 1, 2000, with additional escalation to $55 in 2002, $75 in 2004, and $95 in 2006. After the rate increases went into effect, TFW stopped replacing the water it used for irrigation of the Westwood Shores Country Club.

The Association filed a petition for temporary injunction, requesting that TFW cease irrigation of the Westwood Shores Country Club and replenish Westwood Lake to its original level. The trial court granted the temporary injunction, prompting this accelerated appeal.

## ANALYSIS

### I. Standard of Review

 "To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002). A trial judge has broad discretion in deciding whether to grant or deny temporary injunctions, and the standard of review is a clear abuse of discretion. *See Liberty Mut. Ins. Co. v. Mustang Tractor & Equip. Co.*, 812 S.W.2d 663, 666 (Tex.App.-Houston [14th Dist.] 1991, no writ). The trial court abuses its discretion when "the law is misapplied to established facts, or when the evidence does not reasonably support the conclusion that the applicant has a probable right of recovery." *State v. Southwestern Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex.1975).

### II. Water Was Not Available Under Terms Substantially Similar to Those in Effect in 1996.

TFW argues that it was no longer obligated to replenish Westwood Lake because the rate per acre-foot of water increased from $3.30 in 1996 to $35 in 2000. TFW bases its argument on the language in the Deed and the Assignment that conditions its obligation to purchase water on water being available "under terms substantially similar to those contained within the Limited Raw Water Sales Agreement from Reservoir, ... with adjustments for inflation." The primary question before us in this case is whether the new rates the Trinity River Authority implemented were

substantially similar to those contained in the Raw Water Sales Agreement. A secondary question is whether the increase in the price of water was a result of inflation.

■■■ When examining the language of the Deed and the Assignment, we must give effect to the true intention of the parties as expressed in the instruments. *See Lenape Res. Corp. v. Tenn. Gas Pipeline Co.,* 925 S.W.2d 565, 574 (Tex.1996). The language in a contract is to be given its plain meaning unless doing so would defeat the parties' intent. *DeWitt County Elec. Coop., Inc. v. Parks,* 1 S.W.3d 96, 101 (Tex.1999). We presume that the parties intended every clause to have an effect. *Heritage Res., Inc. v. NationsBank,* 939 S.W.2d 118, 121 (Tex.1996).

**A. The Rate Was Substantially Different.**

The evidence before us indicates that the rate for one acre-foot of water increased from $3.30 in 1996 to $35 in 2000, an increase of approximately 960%. The parties agree that all other terms of the water purchase agreement are substantially similar to those in 1996.

■■■ The rate at which water is available does not appear to be substantially similar to the rate at which it was available in 1996. The price of a good is a material element of a contract. *John Wood Group USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12, 20 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). In fact, price is often the very essence of the contract, without which there cannot be a contract. *See Gerdes v. Mustang Exploration Co.,* 666 S.W.2d 640, 644 (Tex.App.-Corpus Christi 1984, no writ) (holding that a contract for the sale of water was not binding because the price was not specified). Thus, although the remainder of the terms are similar, we cannot say that the "terms are substantially similar" when the evidence indicates the

rate at which water was available changed drastically.

The Association points to language in the Sales Agreement providing for possible rate increases. The Sales Agreement states that the "Annual Standby Charge may be revised from time to time to conform to [the Trinity River Authority's] Resolution No. R–157 . . . ." However, while the anticipation of rate increases indicates that the Trinity River Authority did not breach the contract, it does not indicate that water is still available under the original terms.

We determine that the Association has not demonstrated that water to replenish Westwood Lake was available under substantially similar terms to those available at the time the Deed and the Assignment were entered into. However, the Deed and the Assignment also provided that inflation could cause a difference in the terms. Therefore, we next address whether the change in terms could have been due to inflation.

**B. The Difference Is Greater than Could Be Accounted for by Inflation.**

**1. We Apply the Ordinary Definition of Inflation.**

■■■ Although the term "inflation" was used in the Deed and the Assignment, it is never defined. We will therefore apply the plain, ordinary, and generally accepted meaning of the term. *Heritage Res.,* 939 S.W.2d at 121. Inflation is defined as "[a]n overall rise in prices which results in a decline in the real value of the dollar," BLACK'S LAW DICTIONARY 779 (6th ed.1990), and "an increase in the volume of money and credit relative to available goods resulting in a substantial and continuing rise in the general price level." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY UNABRIDGED 1159 (1993). These definitions of inflation indicate that infla-

tion affects the general prices of goods; thus, a price increase due to scarcity of a particular good would not be inflationary. *See id.*

## 2. The Rate Increase Was Greater than Inflation.

The Deed and the Assignment do not supply an index to measure inflation against, nor have the parties supplied us with any historical data to compare this rate to. In the absence of a specified measure of inflation, we will look to the Consumer Price Index prepared by the Bureau of Labor Statistics. *See* BLACK'S LAW DICTIONARY 779 (6th ed. 1990) ("The primary indexes for measuring the rate of change are the Consumer Price Index and the Producer Price Index."); *Ark. La. Gas Co. v. Fed. Energy Regulatory Comm'n,* 654 F.2d 435, 443 n. 19 (5th Cir.1981) (stating that the Consumer Price Index is one of the three measures of inflation traditionally relied upon by economists). According to the Consumer Price Index, the total inflation from 1996 to 2000 was approximately 10%. *See* U.S. Department of Labor, Bureau of Labor Statistics, Inflation and Consumer Spending, Inflation Calculator (Aug. 30, 2004), *available at* http://www.bls.gov/cpi/home.htm. The rate increase from $3.30 in 1996 to $35.00 in 2000 corresponds to an increase of approximately 960%. This rate increase thus appears to be greater than could be accounted for by inflation alone.

## 3. The Trinity River Authority Indicated that the Rate Increase Was Due to More than Just Inflation.

Further, the evidence indicated that the rate increase was due, at least in part, to factors other than inflation. Robert Stevens of the Trinity River Authority stated:

Q: Why did the TRA institute an increase in price?

A: Well, there were several reasons. The rates have not increased since 1972. As I say, times are changing. Water is becoming very valuable. It's a valuable resource. It's declining in quantities; and we had a firm do a study, first of cost of service, the cost for us to provide that amount of water to replace the amount of water in Lake Livingston, as well as a market survey. And our rates were—since they had not been increased in thirty years— were way too low.

Q: So the changes were based upon inflation and costs of water in general; is that correct?

A: Just in general in Texas, yes.

Thus, there were at least two factors responsible for the increase in the water rate: (1) inflation, and (2) the increased value of water. The Association argues that the rate increase could be the result of inflation despite the presence of additional factors, but the Deed and the Assignment provide only for increases due to inflation, not for increases due to other causes. The mention of only inflation supports an inference that the parties did not mean to include the increased value of water. *See Baty v. ProTech Ins. Agency,* 63 S.W.3d 841, 854 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (applying the maxim *expressio unius est exclusio alterius*—that the naming of one thing excludes another).

Stevens also testified that the price increase had not been changed since 1972. However, the Deed and the Assignment appear to provide only for inflation increasing the price since 1996, not retroactively-applied inflation; the applicable language refers to the terms "in effect as of the date of this Deed ..., with adjustments for inflation" and "in effect of the date of this Assignment ..., with adjust-

ments for inflation." Reading the Deed and the Assignment otherwise could lead to the anomalous result that twenty-four years of inflation would have been applicable the date the agreements took effect. *Cf. Bode v. United States,* .919 F.2d 1044, 1053 n. 8 (5th Cir.1990). As a result, the appropriate base date appears to be 1996. *Cf. id.* ("[T]he effective date of the current version of the statute is the appropriate base date for a cost-of-living adjustment. . . ."). Thus, the portion of the rate increase that was due to inflation that occurred before 1996 would not be within the language of the Deed or the Assignment.

In short, we conclude the Association has not demonstrated that adjustments for inflation caused the rate increase. Under the terms of the Deed and the Assignment, TFW would be excused from having to supply water to replenish Westwood Lake. However, before we can determine that the trial court erred in granting the temporary injunction, we must address the Association's arguments that TFW should be estopped from asserting the contract provision.

### III. The Clause Requiring Substantially Similar Terms is a Condition Precedent, Not a Covenant.

First, the Association argues that the clause requiring that water be available under substantially similar terms is a covenant, not a condition precedent. A condition precedent may be either a condition to the formation of a contract or to an obligation to perform an existing agreement. *Hohenberg Bros. Co. v. George E. Gibbons & Co.,* 537 S.W.2d 1, 3 (Tex.1976). A condition precedent to an obligation to perform is an act or event, which occurs subsequently to the making of a contract, that must occur before there is a right to immediate performance and before there is a breach of contractual

duty. *Id.* However, when the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, then the agreement will be interpreted as creating a covenant rather than a condition. *Id.* Because of their harshness in operation, conditions are not favorites of the law. *Criswell v. European Crossroads Shopping Ctr., Ltd.,* 792 S.W.2d 945, 948 (Tex.1990). Thus, in construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible. *Id.*

We reject the Association's contention that the clause is not a condition precedent, because the Deed and Assignment unambiguously state that TFW is only obligated to maintain the water level "so long as water sufficient for these purposes is reasonably available from Trinity River Authority of Texas under terms substantially similar [to the 1996 terms]." Further, the Deed provides that the Association "acknowledges that Grantor's reservation of water rights could possibly result in the availability of little or no water within Westwood Lake. . . ." To construe the clauses within the Deed and the Assignment as other than conditions precedent would be to ignore their plain language.

### IV. TFW Did Not Breach a Duty to Protest the Rate Increase.

Second, the Association argues that TFW cannot assert a condition precedent because TFW made the performance of the condition precedent impossible. The Association argues that TFW did not protest the rate increase to the Trinity River Authority, and thus should not be allowed to use the rate increase to escape its obligation to replenish Westwood Lake.

### A. TFW Did Not Have a Duty To Protest the Rate Increase.

Although the Association claims that TFW had an express duty to protest any

rate increase, an examination of the Sales Agreement does not reveal any such express duty. The Sales Agreement provided:

> This Agreement is subject to all applicable Federal, State and local laws and any applicable ordinances, rules, orders and regulations of any local, State or Federal governmental authority having or asserting jurisdiction including, but not limited to, the rate-fixing power of the Texas Natural Resource Conservation Commission under Section 12.013, Water Code. Provided, however, that nothing contained herein shall be construed as a waiver of any right to question or contest any such law, ordinance, order, rule or regulation in any forum having jurisdiction, and each party agrees to make a good faith effort to support such proposed laws and regulations which would be consonant with the performance of the Agreement in accordance with its terms.

The Sales Agreement thus only provides that TFW is required to comply with the applicable laws, not that TFW is required to avail itself of the procedures provided by the applicable laws. Because there is no indication that TFW failed to comply with the applicable laws, TFW has not breached an express duty.

**B. There is No Evidence that a Protest Would Have Been Effective.**

The Association also argues that TFW prevented or made impossible the condition precedent. *See Dorsett v. Cross*, 106 S.W.3d 213, 217 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) ("Prevention of performance by one party excuses performance by the other party, both of conditions precedent to performance and of promise.").

The Association asserts that TFW should have been required to protest the rate increase. However, the only evidence before us indicates that any such protest would have been ineffective. Stevens stated that the price of water had not been raised since 1972, and he also stated that water has been increasing in value. Thus, there appears to have been a reasonable basis for the rate increase. The applicable statute only provides for protest when the increase is unreasonable, not when the increase is greater than inflation. *See* TEX. WATER CODE § 12.013(a) ("The commission shall fix reasonable rates for the furnishing of raw or treated water...."). Because the evidence indicates the price increase was due to the Trinity River Authority's failure to raise its rates since 1972 and the increased value of water, TFW's inactivity would not have prevented occurrence of the condition precedent.

## CONCLUSION

We hold that the Association has not proven a probable right to the relief sought because it has not demonstrated that water was available under terms substantially similar to those available in 1996. Under the terms of the Deed and the Assignment, TFW would therefore not be obligated to replenish water in the lake. Further, we hold that TFW was not estopped from asserting it was not obligated to replenish water in the lake. Because the trial court erred in granting the temporary injunction, we affirm appellant's first issue.[1]

We reverse the judgment of the trial court and order the temporary injunction dissolved.

SEYMORE, J., dissenting.

---

1. Because we reverse the judgment of the trial court, we do not reach appellant's remaining issues.

CHARLES W. SEYMORE, Justice, dissenting.

I respectfully dissent.

The majority seems to acknowledge then ignore our standards for review of the trial court's decision to grant a temporary injunction. The purpose of a temporary injunction is to preserve the status quo of a litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex.2002). The decision to grant or deny a temporary injunction is within the sound discretion of the trial court. *Id.* We should reverse the grant of a temporary injunction only if the trial court abused that discretion. *Id.* We may not substitute our judgment for that of the trial court, but we must determine only whether the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Id.* We should draw all legitimate inferences from the evidence in the light most favorable to the judgment of the trial court. *Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 883 (Tex. App.-Dallas 2003, no pet.). Additionally, we should not assume that the evidence presented at a preliminary hearing will be the same as the evidence developed at a full trial on the merits. *Id.* at 885.

An applicant for a temporary injunction must plead and prove (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru*, 84 S.W.3d at 204. These are the only issues before the trial court; the underlying merits of the case are not presented. *See Tom James*, 109 S.W.3d at 882. Therefore, an appeal from an order granting a temporary injunction does not present for appellate review the ultimate legal issues of the case. *Id.* at 883 We may review only whether the trial court abused its discretion in concluding that an applicant showed a cause of action,

a probable right to the relief sought, and a probable, imminent, and irreparable injury. *See id.*

## DISCUSSION

The assignment of water rights requires TFW to

maintain the water at a sufficient level so that Association members may also enjoy the benefits of Westwood Lake for aesthetic and recreational purposes so long as water suitable for these purposes is reasonably available from Trinity River Authority of Texas [TRA] under terms substantially similar to those contained within the [Water Sales Agreement], between [WSI], and [TRA] in effect as of the date of this Assignment of Water Rights, with adjustments for inflation.

In its first and second issues, TFW claims that by issuing the injunction, the trial court impliedly found that under the contract (1) the Lake water level was inadequate, and (2) the terms of a current Water Sales Agreement were substantially similar to the terms of the Water Sales Agreement in effect in 1996. TFW further claims the trial court abused its discretion by making these findings because they are not supported by any probative evidence. However, because the underlying merits of a case were not before the trial court, I do not agree with appellant's contention that issuance of the injunction implies the trial court made findings on these ultimate legal questions. Therefore, an appeal of the temporary injunction does not present for review the ultimate questions of whether TFW is in breach of the contract because the water level was insufficient, or because water is available under terms similar to the previous contract. *See id.* at 882–83 (holding that the ultimate question of whether covenants not to compete were enforceable was not at issue in an appeal

from the denial of a temporary injunction). We may review only the trial court's exercise of discretion in determining whether appellee showed it had a probable right to relief in its breach of contract claim. *See id.* at 883.

### PROBABLE RIGHT TO RELIEF

#### WATER LEVEL

First, TFW claims there was no evidence that the Lake water level was inadequate. It notes that a TFW representative testified the water level was adequate for recreational and aesthetic purposes. However, the Association presented evidence that its members had complained the Lake conditions were inadequate, fishing in certain areas was no longer possible, and some boat docks were unusable because of the low level of water. In addition, one homeowner had sold his home on the Lake partially because he was frustrated with the conditions resulting from the low water level. When a trial court bases a decision concerning the grant of a temporary injunction on conflicting evidence there is no abuse of discretion. *Id.* at 883. Based on the conflicting evidence, I would hold the trial court did not abuse its discretion in concluding the Association proved it had a probable right to relief based on TFW's failure to maintain an adequate water level.

#### TERMS OF WATER SALES AGREEMENT

TFW also claims that under the plain language of the contract, it is relieved of any obligation to supply water to the Lake because water is no longer available from TRA under terms substantially similar to those in the Water Sales Agreement. Under the Water Sales Agreement WSI paid $1551.00 per year for up to 470 acre feet of water ($3.30 per acre foot). In 2000, TRA raised the price of water to $35 per acre foot, with rates set to increase an additional $20 per acre foot every two years

through 2006. TFW claims that considering this price increase, there is no evidence the terms contained in the previous Water Sales Agreement are "substantially similar" to terms available to TFW today. Both parties agree that the price of water is the only term in the agreement that has changed.

The assignment of water rights requires TFW to maintain the water at a level sufficient for aesthetic and recreational enjoyment so long as water "suitable for these purposes" is available under terms substantially similar to those contained within the Water Sales Agreement. The deed conveying the lake to the Association is similar, but it requires maintenance so long as water "sufficient for these purposes" is available. To determine the intent of the parties to a contract, we will consider all writings that pertain to the same transaction. *DeWitt Co. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 102 (Tex. 1999). Neither the deed nor the assignment requires TFW to purchase the same amount of water previously purchased under the Water Sales Agreement. The contractual provisions require only that water "sufficient" or "suitable" be available. The Association presented evidence that until 2000, the water level of the lake was sufficient for recreational and aesthetic purposes. It presented additional evidence that from 1995 to 2000, less than 16 acre feet of water were pumped into the lake from TRA each year. Under the Water Sales Agreement TFW could use up to 470 acre feet of water from TRA each year; however less than 16 acre feet was sufficient and suitable to maintain the water level for aesthetic and recreational purposes. Accordingly, I would hold that the trial court did not abuse its discretion in concluding that the above estimated amount of water is available to TFW under substantially similar terms.

Although WSI paid $3.30 per acre foot of water, this rate was applicable only when over 400 acre feet of water were purchased. According to the rate schedule in effect at that time, which was incorporated into the Water Sales Agreement, the minimum charge was $500 per year for up to 50 acre feet of water. Under the revised water rates, the minimum charge is $1,000 for up to 10 acre feet of water. However, the cost for 20 acre feet was $1,100 in 2002, and is currently $1,500. Based on this cost increase for the amount of water sufficient to maintain the water level of the lake, I cannot conclude that the trial court abused its discretion in determining that the Association had established a probable right to the relief on the ground that water was available to TFW under substantially similar terms.

Additionally, a provision that water, under substantially similar terms, be available "with adjustments for inflation." is included in the assignment of water rights. The Association presented evidence that the rate increase in 2000 was based on the cost of water in general and inflation. In reviewing the trial court's decision, we must draw all legitimate inferences from the evidence in the light most favorable to the grant of the temporary injunction. *See Tom James,* 109 S.W.3d at 883. Based on the evidence in the record, it is my considered opinion the trial court did not abuse its discretion in determining that the Association established a probable right to the relief based on the cost of water with adjustments for inflation.

SPECIFIC PERFORMANCE

In its third issue, TFW contends the temporary injunction impermissibly requires specific performance of the contract. Specific performance of a contract will be granted only if there is a mutuality of remedy, which TFW claims is not present here. *See Smith v. Nash,* 571 S.W.2d

372, 375 (Tex.App.-Texarkana 1978, no writ); *see Fed. Sign v. Texas S. Univ.,* 951 S.W.2d 401, 409 (Tex.1997) (noting mutuality of remedy is the right of both parties to a contract to obtain specific performance) *superseded by statute on other grounds as stated in Gen. Servs. Comm'n v. Little–Tex. Insulation Co.,* 39 S.W.3d 591, 593 (Tex.2001). However, by issuing a temporary injunction a trial court is not enforcing a contract, but preserving the status quo of a litigation's subject matter pending a trial on the merits. *See Cardinal Health Staffing Network, Inc. v. Bowen,* 106 S.W.3d 230, 239 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (citing *Butnaru,* 84 S.W.3d at 204). Accordingly, the trial court was not requiring specific performance of the contract. Nevertheless, mutuality of remedy is available in this case. Under the contract, the Association is required to accept the burden of TFW's water rights and pay certain taxes and assessments. Accordingly, I would overrule TFW's third issue.

TERMS OF INJUNCTION

In its fourth issue, TFW claims the trial court abused its discretion by imposing new duties and obligations on TFW that were not contemplated by the contract. Under the injunction, TFW was directed to:

> maintain the water level of Westwood Lake no lower from the top of the drain on the lake than the deficiency of average rainfall based on· the records for reporting at Bush Intercontinental Airport as reported by the Houston Chronicle on Monday of each week.

Additionally, under the injunction TFW's obligation was limited to a maximum of 200 acre feet of water per year. TFW claims the trial court impermissibly altered certain terms in the original contract. This claim is based on TFW's assertion that its contractual obligation is limited to

maintaining the water at a level appropriate for aesthetic and recreational purposes. We agree with TFW's contention that a court, while construing a contract, may not revise it so as to impose additional duties on a party. *See Royal Indem. Co. v. Marshall,* 388 S.W.2d 176, 181 (Tex.1965). However, as previously noted, the purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru,* 84 S.W.3d at 204. By issuing a temporary injunction, a trial court is not enforcing a contract with altered terms, but preserving the status quo. *See Cardinal Health Staffing Network, Inc.,* 106 S.W.3d at 239 (noting that the purpose of a temporary injunction is not to enforce anything). A trial court exceeds its authority if its temporary injunction order changes the status quo. *Barnstone v. Robinson,* 678 S.W.2d 562, 563 (Tex.App.-Houston [14th Dist.] 1984, writ dism'd).

The status quo is the last, actual, peaceable, non-contested status that preceded the pending controversy. *State v. Southwestern Bell Tel. Co.,* 526 S.W.2d 526, 528 (Tex.1975). The Association presented evidence that prior to 2000, the water level of the Lake was to the top of a drainpipe, a level which was in compliance with the contract. This level fluctuated by approximately one foot during that time. The temporary injunction requires TFW to maintain the water level no lower from the top of the drain than the deficiency of average rainfall in Houston. In setting this requirement, the trial court indicated that the lowest deficiency of average rainfall of the year had been ten to twelve inches. Therefore, because this requirement will keep the water at a level that is similar to the water level prior to 2000, it does not change the status quo. Additionally, under the injunction, TFW is not required to pump more than 200 acre feet of water into the Lake per year. The trial

court set this limit based on the increased price of water and the TFW's prior contract with TRA for 470 acre feet of water. There was no evidence that more than 200 acre feet of water would be necessary to maintain the water at the required level under the injunction. Consequently, I cannot conclude that the terms of this temporary injunction change the status quo. Accordingly, it is my considered opinion that the trial court did not exceed its authority.

BALANCE OF EQUITIES

In its fifth issue, TFW contends the trial court abused its discretion by failing to balance the equities between the parties. In considering an application for a temporary injunction, a trial court balances the equities between the parties as well as the resulting conveniences and hardships. *Universal Health Servs., Inc. v. Thompson,* 24 S.W.3d 570, 578 (Tex. App.-Austin 2000, no pet.). A trial court may consider whether the applicant would suffer significant or slight injury if the injunction were erroneously denied, and whether the injury to the opposing party would be significant or slight if the injunction were erroneously granted. *NMTC Corp. v. Conarroe,* 99 S.W.3d 865, 869 (Tex.App.-Beaumont 2003, no pet.). TFW claims the trial court failed to consider the equitable hardships faced by TFW, such as the current high cost of water and the requirement that it maintain the Lake at a level not contemplated by the contract. However, the record indicates the trial judge balanced the hardship of TFW against the hardship of the Association. In its Temporary Injunction Order, the trial court noted, as supported by the record, that if TFW continued to inadequately replenish the Lake, dry areas around the Lake would increase preventing the Association members from using even more portions of the Lake. At the hearing

on the motion for the temporary injunction, the court indicated that it was considering the rainfall in the area as well as the increased cost of water in setting the parameters of TFW's obligations. Considering the supporting evidence, I would conclude that the trial court did not abuse its discretion when it balanced equities in favor of TFW.

IRREPARABLE HARM

In its sixth issue, TFW claims the trial court abused its discretion by finding appellee would be irreparably harmed if the temporary injunction were denied. Harm is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru,* 84 S.W.3d at 204. The Association presented testimony and photographs depicting the water level at the time of the hearing to support its contention that its members cannot enjoy the recreational and aesthetic benefits of the Lake that they once enjoyed. Banks of the Lake where the water had receded were "unsightly" and sometimes emanated a bad odor. Several homes were on these banks. Boat docks that had been built in the water were on dry land and bulkheads were exposed. One former Association member testified that he sold his home because the water level of the Lake decreased, and he could no longer fish from his property. This is evidence of irreparable harm. *See Hayter v. Fern Lake Fishing Club,* 318 S.W.2d 912, 914 (Tex.App.-Beaumont 1958, no writ); *Positive Feed, Inc. v. Wendt,* Nos. 01–96–00614–CV, 01–96–01250–CV, 1998 WL 43321, at *10 (Tex.App.-Houston [1st Dist.] Feb. 5, 1998, pet. denied) (not designated for publication) (both holding the loss of enjoyment of one's home constitutes irreparable injury for purposes of injunctive relief).

TFW claims that the Association presented no evidence of injury because the photographs they submitted depicting the condition of the Lake were taken on random dates and did not accurately represent the average water level of the Lake. Because the evidence on this issue was conflicting, I would hold that the trial court did not abuse its discretion by finding the Association would suffer irreparable harm. *See Tom James,* 109 S.W.3d at 883. Accordingly, I would affirm the trial court's order granting a temporary injunction.