Opinion issued December 14, 2006 

















In The

Court of Appeals

For The

First District of Texas






NO. 01-06-00182-CV

__________


CMNC HEALTHCARE PROPERTIES, LLC, MERIDIAN HEALTHCARE
PROPERTIES, LLC, HEALTHCARE DEVELOPMENT, LTD., JAMES T.
MUSKA, EDWARD NEESE, A. FLOYD COOPER, AND JAMES T.
COLLIER, Appellants


V.


MEDISTAR CORPORATION, Appellee






On Appeal from the 113th District Court

Harris County, Texas

Trial Court Cause No. 2004-36311






MEMORANDUM OPINION

 Appellants, CMNC Healthcare Properties, LLC, Meridian Healthcare
Properties, LLC, Healthcare Development, Ltd., James T. Muska, Edward Neese, A.
Floyd Cooper, and James T. Collier, bring this accelerated interlocutory appeal (1)
challenging the trial court's order granting appellee, Medistar Corporation's,
application to modify a temporary injunction. In their sole issue, appellants contend
that the trial court erred in granting the application "because there is no evidence
supporting the trial court's decision." We reverse the trial court's February 7, 2006
order modifying the temporary injunction and further order that such modified
injunction be dissolved. 

Factual and Procedural Background


 In its original petition and application for injunctive relief, Medistar
Corporation ("Medistar"), a real estate development firm specializing in the
development of medical facilities, alleged that it had compiled "highly proprietary"
and "confidential trade secret[s]" including financial pro formas, cost presentations,
cost/profit analyses, and other information concerning clients, financial and equity
sources, and contractors "involved in the development of medical facilities." It also
alleged that appellants, former officers or employees of Medistar, left Medistar to
form a competing development company and that appellants used Medistar's
proprietary information and trade secrets in securing the rights to develop a medical
center project that Medistar had been pursuing prior to appellants' departure. 
Medistar further alleged that, upon leaving Medistar, appellants took and used
confidential client lists, financial source contacts, and "development reports"
containing proprietary information on Medistar projects, "in an attempt to steal
multiple additional projects." Medistar asserted claims of conversion, theft of trade
secrets and proprietary and confidential information, tortious interference, fraud, and
breach of fiduciary duties.

 In its request for injunctive relief, (2) Medistar asserted that it would suffer
immediate and irreparable harm for its "loss of valuable trade secrets and proprietary
information" and that it did not have an adequate remedy at law. Medistar further
asserted that appellants had impaired "its business operation and reputation" and had
"threatened to cause the imminent loss of unique and irreplaceable ownership
interests in existing development and pre-development projects." Thus, Medistar
sought to enjoin appellants from using its trade secrets and proprietary information
with respect to a number of projects.

 In August 2004, the trial court entered a temporary injunction, restraining
appellants from utilizing "[a]ny Medistar Development Reports, project files,
financial pro formas, clients lists or financing source lists, or any information derived
therefrom which was obtained by and/or disclosed to [appellants] while employed by
Medistar . . . in connection with [certain] projects and entities," which were
specifically named in an attached exhibit. The temporary injunction further restrained
appellants from utilizing "said proprietary information and trade secrets to solicit
Medistar's clients and financing sources or to otherwise compete or attempt to
compete against Medistar" on the named projects. Appellants have not challenged
in this appeal the original temporary injunction or the projects named therein. (3)

 On December 5, 2005, Medistar filed an application to modify the temporary
injunction, alleging that Medistar had been "planning to perform work" on a project
at the Northeast Medical Center Hospital ("NMCH"), but that when Neese left
Medistar he "took this project for his personal financial benefit." Medistar requested
that the trial court add NMCH to the list of projects identified in the original
temporary injunction. Medistar attached a confidentiality agreement, dated December
19, 2002, between NMCH and Medistar "concerning possible real estate acquisition
and development transactions" on NMCH's premises. The confidentiality agreement
was signed by Neese on behalf of Medistar, but was not signed by NMCH. Medistar
also attached deposition testimony from Neese, in which he stated that he started
consulting work for NMCH in May 2005 for a new company, the Huntwick Group
("Huntwick"), (4) he had an agreement with Huntwick to be paid a salary of $9,000 per
month, and he was in the process of preparing a "request for proposal" for NMCH to
solicit bids from health care real estate investors. However, Neese stated that he did
not work on this project when he was at Medistar and that, although he signed a
confidentiality agreement with NMCH on behalf of Medistar in December 2002, he
did not know what development was contemplated by NMCH at that time. Neese
denied that he took any information that pertained to NMCH when he left Medistar. 
Medistar also attached the affidavit of Monzer Hourani, Medistar's chief executive
officer, who stated that while Neese was employed at Medistar, he assigned Neese to
an NMCH project.

 In their response, appellants asserted that Neese, under his agreement with
Huntwick, was not working with NMCH as a developer, but was instead working for
NMCH as a consultant hired solely to "coordinate[] and facilitate[] information from
the hospital to developers" and that he was not "interfering with Medistar's business
opportunities." Neese testified in an attached affidavit that he was employed as a
consultant with Huntwick, "a real estate research and coordinating company" that
"does not engage in any like and/or similar business that Medistar performs," and
there was nothing proprietary to Medistar that was relevant to his work for NMCH. 
Neese further testified that, as a consultant, he "coordinate[d] the reciprocal flow of
information and bids between the hospital and potential developers," he was "legally
prohibited from recommending one entity over the other and/or communicating
information from one bid to any other potential bidding party," and he "in no way
[could] participate in any development and profits from development relevant to any
bidder/developer." Neese conceded that while at Medistar, he "attempted to present
Medistar's interests to [NMCH] in initial communications," but that there was no
"business relationship effectuated." However, Neese also stated that any proprietary
information from Medistar "would not be relevant."

 Appellants filed an amended response, and attached an affidavit from Syble
Missildine, NMCH's chief executive officer, who testified that NMCH retained
Neese on May 10, 2005, "to provide consulting services to a competitive bidding
process" and not "as a developer and/or financier/investor." She also noted that
Medistar "was offered the opportunity to submit a closed bid relevant to their ability
to function as a developer and/or financier/investor," it submitted a sealed bid, and,
although late, it was considered by NMCH. Missildine also explained that Neese did
not participate in the unsealing or scoring of the bids and that Neese had "not
interfered and/or been competitive with the business opportunities relevant to and/or
touching on Medistar's operation as developer and/or financier/investor." Appellants
also attached deposition testimony from David Glassburn, NMCH's former chief
financial officer, who testified that he hired Neese to help him "put the bid packet
together" and "evaluate the bid packet."

 At the hearing on Medistar's application to modify the temporary injunction, 
Hourani testified that around December 2002, he assigned Neese to a development
project at NMCH, Neese signed a confidentiality agreement on behalf of Medistar,
Hourani and Neese reviewed a financial pro forma for the project, and Neese
subsequently advised Hourani that the project had been placed on hold. Hourani
agreed that NMCH did not conduct a sealed-bid process for any project in 2002. 
After Medistar learned Neese had become involved with NMCH, Medistar searched
for its NMCH file, but could not locate it. 

 Medistar introduced into evidence a May 9, 2005 proposal from Huntwick to
NMCH to provide "real estate consulting services" in a "bidding and sale process,"
which was accepted by NMCH on May 10, 2005 (the "consulting agreement"). (5) The
consulting agreement set forth a number of "consulting services" that Neese, on
behalf of Huntwick, agreed to provide to NMCH. Hourani testified that some of
these services were "the type of work" that Neese performed while at Medistar and
the "type of work" Medistar performs. For example, the consulting agreement stated
that Huntwick would "[a]ssist the real estate attorney with drafting the development
agreement, purchase and sale agreement[,] and the ground leases," "[a]ssist the
architects with preparing a preliminary site plan and specification list for the new
building," and "participate, as needed, in the closing of the sale of the existing
building." Hourani asserted that Neese was doing more than just bidding work and
instead was "doing things that [Neese] did at Medistar." Hourani also asserted that
the NMCH project placed on hold in 2002 was the same project for which the bidding
process was commenced in 2005.

 Hourani conceded that Medistar markets itself as a company that develops
hospitals and medical facilities and invests in real estate projects. Hourani agreed
that in November 2005, pursuant to a request from NMCH, Medistar submitted a
sealed bid to develop, acquire, and finance a project at NMCH and that NMCH never
requested Medistar to serve in the capacity as a consultant. Hourani also agreed that
NMCH had the right to hire a consultant to act on its behalf in assisting developers,
reviewing development agreements, assisting architects with preparing site plans,
representing NMCH's interests, and advising NMCH. Moreover, Hourani agreed that
this was "separate and distinct from what Medistar would do if Medistar [had been]
awarded the [NMCH] project." However, Hourani stated that Medistar would have
been willing to act as a bid coordinator, even though doing so would have excluded
Medistar from serving as a financier and developer of the project. In support of this
assertion, Hourani stated that Medistar had, on one occasion in 1992, developed a
bidding and evaluation process for a medical facility, but Hourani agreed that Neese
had not performed this type of work while employed at Medistar. 

 Although Hourani agreed that Neese did not sign an employment agreement
that limited Neese's ability to work for a hospital, Hourani provided somewhat
contradictory testimony as to what, in his opinion, Neese should be prohibited from
doing. Although Hourani agreed that Neese could work for any hospital entity in any
capacity "short of being a developer," he then asserted that Neese could not work in
any capacity at a facility where Medistar worked on a project. 

 Finally, Hourani asserted that Medistar had been damaged in the amount of $28
million, but he did not provide any testimony connecting this damage figure, or any
other damage figure, to the alleged loss of the right to develop or the right to serve
as a consultant on the NMCH project. Moreover, Hourani admitted that he did not
bring any documents to the trial court to show that Medistar was injured. Hourani
also agreed that he had no knowledge of whether Neese was present when NMCH
unsealed the bids. Although Hourani alleged that Neese interfered with the bid
process in 2005 and altered Medistar's bid, he conceded that he did not have any
evidence that Neese assisted the winning bidder of the NMCH project or interfered
with the sealed-bid process in any way. 

 Glassburn, NMCH's former chief financial officer, testified that Neese was
"hired as a consultant to help [him] develop a bid packet to sell the existing office
buildings and to find a developer that would buy the existing office buildings and to
construct a similar office building" on NMCH's main campus. Glassburn stated that
Neese was not hired as a developer because NMCH was sending out sealed bids to
hire a developer, and instead Neese was hired to represent the interests of the hospital
and not the interests of the developer. Glassburn hired Neese as a consultant
"because of his general expertise as a developer," and he did not see a conflict of
interest because Neese would not be bidding on the project.

 Neese testified that when he left Medistar he was not working on an NMCH
project, Medistar was a "developer of medical facilities," and Medistar never
"attempted to engage in the business of consulting regarding bidding processes and
scaling procedures." Neese stated that when he sent NMCH the confidentiality
agreement in 2002, he had done so in regard to the possible acquisition of a facility
on the NMCH campus, and he agreed that this acquisition was one of the assets at
issue in the November 2005 sealed-bid offer. However, Neese's consulting
agreement with NMCH was "to provide services to coordinate a bidding process," to
act as NMCH's agent in the sealed-bid process, to assess and protect NMCH's
interests, and to assist in the preparation of the proposed bid packets. He explained
that these functions were distinct from what a developer and financier, like Medistar,
would do. Neese noted that Medistar did not provide the types of services described
in the consulting agreement and, because of his role, he was prohibited by law from
participating in the project as an investor or developer. He also stated that he did not
interfere with Medistar's ability to submit a sealed bid, did not interfere with the bid
packet being sent to Medistar, did not take any proprietary information from Medistar
to use in the sealed-bid process, was not present when the sealed bids were opened,
had no discussions with bidders concerning the preparation of bids or any information
contained in the sealed-bid package, and did not assist the winning bidder. Neese
also stated that he did not have an employment agreement with Medistar prohibiting
him from working with NMCH as a consultant.

 On cross-examination, Neese agreed that he spoke with Glassburn in 2002
about the possible purchase of medical office buildings and he also agreed that some
of the services outlined in the consulting agreement were services that Medistar could
provide, but he qualified his answer by noting that Medistar would provide those
services "from a developer's perspective." In regard to his specific duties, Neese
stated that he was hired to prepare a set of documents to be presented to bidders so
that they could prepare and submit their sealed bids for the items on which NMCH
was seeking a bid. He also assisted NMCH in preparing the invitation to send to
prospective bidders and he reviewed the bid packet before sending it to prospective
bidders. Neese noted that Medistar was listed as a respondent for the bid packet. 
Finally, Neese reiterated that the "bid process was not something that [he] did at
Medistar" and that he did not have any influence on awarding the project because he
"was not a participant in the evaluation of the sealed bids."

 The trial court granted Medistar's application to modify the temporary
injunction and ordered that the August 2004 temporary injunction should be
"supplemented to include any and all projects pertaining to the [NMCH]." 

Standard of Review

 The purpose of a temporary injunction is to preserve the status quo of a
litigation's subject matter pending trial. Butnaru v. Ford Motor Co., 84 S.W.3d 198,
204 (Tex. 2002). Trial courts have broad discretion in deciding whether to grant or
deny a temporary injunction, and the standard of review is for a clear abuse of
discretion. Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd., 80 S.W.3d 601,
607 (Tex. App.--Houston [1st Dist.] 2002, no pet.); see also T.F.W. Mgmt., Inc. v.
Westwood Shores Prop. Owners Ass'n, 162 S.W.3d 564, 567 (Tex. App.--Houston
[14th Dist.] 2004, pet. denied). Accordingly, we will not reverse a trial court's order
granting a temporary injunction unless it is "so arbitrary as to exceed the bounds of
reasonable discretion." Tel. Equip. Network, Inc., 80 S.W.3d at 607. An erroneous
application of the law to undisputed facts constitutes an abuse of discretion. Id. 
However, we draw all legitimate inferences from the evidence in the light most
favorable to the trial court's order. Id.

 To obtain a temporary injunction, an applicant must plead and prove (1) a
cause of action against a defendant; (2) a probable right to the relief sought; and (3)
a probable, imminent, and irreparable injury in the interim. Butnaru, 84 S.W.3d at
204. A probable right of relief is shown by alleging a cause of action and presenting
evidence that tends to sustain it. T-N-T Motorsports, Inc. v. Hennessey Motorsports,
Inc., 965 S.W.2d 18, 23-24 (Tex. App.--Houston [1st Dist.] 1998, pet. dism'd). An
irreparable injury is shown if there is no adequate remedy at law, i.e., the applicant
cannot be adequately compensated in damages or damages cannot be measured by
any certain pecuniary standard. Butnaru, 84 S.W.3d at 204; see also Ahmed v. Shimi
Ventures, L.P., 99 S.W.3d 682, 692 (Tex. App.--Houston [1st Dist.] 2003, no pet.).

Temporary Injunction

 In their sole issue, appellants argue that the trial court erred in granting
Medistar's application to modify the temporary injunction "because there is no
evidence supporting the trial court's decision." In support of their argument,
appellants assert that the evidence established that Medistar did not engage in the
type of consulting services provided by Neese, Neese did not act as a developer,
manager, or financier of the NMCH project, and Neese in no way interfered with
Medistar's bid to develop the NMCH project. Thus, Neese contends that Medistar
presented "no evidence of imminent harm, irreparable injury, or lack of an adequate
remedy at law." 

 Here, the undisputed facts show that Medistar is a developer and financier of
medical facilities and related real estate projects and, in 2005, NMCH requested a
sealed bid from a number of developers, including Medistar, to develop a project at
NMCH. Medistar submitted a bid pursuant to this request, and NMCH awarded the
project to another bidder. Medistar agrees that by submitting its bid to develop the
project, it was legally prohibited from acting as a coordinator or consultant in the
bidding process, the capacity in which Neese is seeking to act. Although Hourani,
Medistar's CEO, initially stated that some of the services set forth in the consulting
agreement were the type of work engaged in by Medistar, Hourani subsequently
recognized that Neese, to the extent that he was even providing these services, would
be providing them on behalf of NMCH and not as a developer or financier of the
project. Specifically, Hourani agreed that a consultant hired to act on NMCH's behalf
would provide services "separate and distinct from what Medistar would do" if
awarded the project on which it was bidding. 

 Furthermore, although Hourani testified that Medistar would have been willing
to act in the capacity of a consultant, Hourani agreed that NMCH did not ask it to
provide such services, Medistar had performed a similar function on only one other
occasion in 1992, and Neese did not perform in this capacity while at Medistar. 
NMCH witnesses supported Neese's testimony that Neese was hired solely to act as
a consultant to assist in preparing the bid packet that was sent to prospective bidders
and that Neese was hired to perform this function based on his general expertise in
medical-facilities development. The record contains no evidence that Neese used, or
even could have used, Medistar's proprietary information or trade secrets in
performing the functions for which he was retained, and Medistar offered no
explanation as to how this information would be relevant to a consultant, like Neese,
who is assisting in the preparation of a bid packet to be submitted to a number of
bidders, including Medistar. Moreover, Hourani agreed that, although he had his
personal suspicions, he did not have any evidence that Neese interfered in any way
with the bid process or exercised any influence over NMCH's selection of the
winning bidder. 

 Finally, Hourani's vague reference to damages in the amount of $28 million did
not establish Medistar's lack of an adequate remedy by law because the alleged
damages figure was not connected to any another evidence relevant to the modified
injunction. The record contains no evidence that the NMCH project was valued at
$28 million, and Medistar failed to explain how Neese's contract, valued at
approximately $170,000, could cause Medistar irreparable harm. Hourani himself
even agreed at trial that he had not presented the trial court with any documentation
of Medistar's injury. Thus, in regard to the modified portion of the temporary
injunction, i.e., the portion of the injunction related to "any and all projects pertaining
to NMCH," we conclude that Medistar has not demonstrated irreparable injury or
imminent harm. 

 In support of its argument, Medistar makes several statements in its brief that
are not supported by the record. For example, although Medistar asserts that Neese
has "no independent information, experience or training that [is] not proprietary to
Medistar," it does not provide any legal or factual basis for this extremely broad
assertion. Medistar also asserts that "Neese misappropriated trade secrets by entering
into a development agreement with NMCH," a development that Medistar asserts it
"originated." However, the record contains no evidence that Neese ever entered into
a development agreement with NMCH. In fact, even Hourani appeared to concede
in his testimony the distinction between the development services offered by Medistar
in its sealed bid and the services performed by Neese pursuant to the consulting
agreement. Although Neese conceded that some of the services outlined in the
consulting agreement were services Medistar could provide, he qualified his answer
by noting that Medistar would provide those services "from a developer's
perspective." Moreover, the record contains no evidence that Medistar "originated"
the project at issue or had any vested right to develop the project. Instead, the
evidence before us shows that NMCH conducted a sealed-bid process and awarded
the bid to another developer without any interference from Neese. 

 There is also no evidence, as Medistar alleged, that upon leaving Medistar,
Neese "took the [NMCH] project for his personal financial benefit." Rather, the
undisputed evidence establishes that NMCH solicited sealed bids for the project,
Neese was not and could not have been a bidder on the project, and the bid was
awarded to a third party. There is no evidence that Neese conspired with this third
party. Finally, Medistar failed to present any evidence to support its assertion that
Neese "controlled the bid process for the [NMCH] project" and that "Medistar was
not awarded the bid" because of Neese. As we previously stated, the evidence
presented at the temporary injunction failed to demonstrate that Neese controlled the
evaluating and scoring of the bids or that he had any influence on NMCH's decision
to select a bidder. Moreover, Medistar presented no evidence that NMCH conducted
the sealed-bid process in bad faith with assistance from Neese.

 We note that our review is limited solely to the modified temporary injunction. 
The original temporary injunction makes clear that it was issued to restrain appellants
from using any potential trade secrets or proprietary information obtained by
appellants while employed by Medistar in connection with a number of projects and
entities so that appellants could not use the information to solicit Medistar's clients
or compete against Medistar on the identified projects. As asserted by Medistar in
its brief: "the very purpose of the original temporary injunction was to prohibit
appellants from benefitting and/or utilizing proprietary information belonging to
Medistar in their continuing efforts to compete on various Medistar projects." 

 Here, there is no evidence to suggest that Neese was competing with Medistar
in its efforts to secure the bid to serve as the developer or financier of the NMCH
project and, consequently, there is no evidence that Medistar has been irreparably
injured with respect to NMCH so as to warrant the modification of the temporary
injunction. Accordingly, we hold that the trial court abused its discretion in
modifying the temporary injunction.

 We sustain appellants' sole issue.

 Conclusion

 We reverse the trial court's February 7, 2006 order modifying the temporary
injunction. We further order that the trial court's February 7, 2006 order modifying
the temporary injunction be dissolved. (6) 


 

 Terry Jennings

 Justice


Panel consists of Justices Nuchia, Jennings, and Higley.



1. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (Vernon Supp. 2006).
2. See Tex. Civ. Prac. & Rem. Code Ann. § 65.011 (Vernon 1997).
3. Furthermore, the parties have not presented this Court with the record of the original
temporary injunction hearing.
4. Medistar introduced evidence showing that Huntwick was an entity formed by
Neese's girlfriend, and that Neese was Huntwick's only employee.
5. The consulting agreement required NMCH to make six monthly payments of $10,000
to Neese and also provided for another $110,000 in contingent payments to Neese.
6. All pending motions are denied.