Delma BAUCUM, Appellant,

v.

**TEXAM OIL CORPORATION, Appellee.**

**No. 5933.**

Court of Civil Appeals of Texas.

El Paso.

Dec. 27, 1967.

Rehearing Denied Jan. 24, 1968.

Finley & Scogin, Kermit, for appellant.

Boyd Laughlin, W. B. Browder, Jr., Milton L. Bankston, Midland, for appellee; Stubbeman, McRae, Sealy & Laughlin, Midland, Hill, Betts, Yamaoka, Freehill, & Longcope, New York City, of counsel.

## OPINION

FRASER, Chief Justice.

This is an appeal from the granting of a temporary injunction by the trial court restraining one Delma Baucum from disposing of a number of different kinds of assets and properties. The original petition prayed for relief, an accounting, and judgment for all sums due and owing to the plaintiff, along with a lien upon any assets acquired by Baucum in derrogation of his duties to the corporation.

The plaintiff-appellee, Texam Oil Corporation, hereinafter referred to as "Texam", is the surviving corporation of a merger between itself and Santiago Oil and Gas Company, and is a corporation active in all phases of the oil business, such as drilling and producing oil and gas, obtaining and promoting leases, etc. From 1959 through the early fall of 1966 the officers of Texam consisted of Leland Redline, President; Delma Baucum, Vice-President; and J. Kirk Cansler, Secretary-Treasurer. Each of these men served on the Board of Directors of the corporation. The duties and obligations of the three gentlemen above named were as follows. Mr. Redline was in charge of administrative duties, and, as an experienced geologist, screened or passed on the various oil deals and was responsible for locating leases, farmouts, etc., and participated with Delma Baucum in the actual planning of the drilling operations, such as matters pertaining to the type of equipment used, etc. Mr. Baucum was the production superintendent, and his duties consisted of supervising of the drilling and producing wells and the purchasing of equipment and supplies for the drilling operations and the manner and conduct of the acquisition of said equipment. Mr. Cansler, as secretary-treasurer, performed the duties of general office manager and accountant and was in charge of the invoicing and paper work relating to the acquisition of leases and lands. It is alleged that after Cansler's employment by Santiago, the predecessor of Texam, he instructed that a "purchase order" system be inaugurated within the company. This system provided that authorized personnel should write up a purchase order describing the equipment to be purchased and from whom, and where and how the equipment was to be utilized. A copy of this purchase order was to be tendered to the vendor who would invoice the equipment to the company upon delivery of same. Cansler would compare the purchase order with the invoice and approve same, and after approval of the invoice, checks would be issued by the company in payment for the equipment. Mr. Redline, Mr. Baucum and Mr. Cansler were the officers authorized to issue purchase orders and to sign the checks in payment of the invoices tendered pursuant to the transaction.

According to the record, in the latter part of 1960 there was a discussion between Redline, Baucum and Cansler to the effect that they could make money by purchasing equipment required by the corporation and sell it to the corporation at a higher price, which maneuver would, of course, produce profit for the three men. The record indicates that this plan or scheme was agreed upon by the aforesaid three officers of the corporation, and put into effect. In order to carry out this plan, the three men put into operation an invoicing vehicle known as "D. Webber & Co.". It was agreed that Baucum, in conjunction with Redline, would determine the equipment required by the company, then Baucum would locate the equipment and buy it in the name of D. Webber & Co., and then issue the purchase order from Texam to Webber under the procedure outlined above. D. Webber & Co. would then invoice Texam, and Cansler would authorize purchase after matching

the invoice with the purchase order, and authorize the preparation of a check by Texam in payment of the Webber invoice. The three men then, in turn, would execute the checks payable to D. Webber & Co. and forward them to it. It appears that the invoices of D. Webber & Co. were prepared by Cansler at his home pursuant to a memorandum from Baucum as to the price to be charged for the goods. Further carrying out this plan, the three men established an account with the First State Bank, Odessa, Texas, and all three men executed guarantee agreements with the bank for D. Webber & Co. It appears that neither the stockholders nor the directors of the corporations were ever informed of this operation by the three officers, Cansler testifying that it was "implicit in the thing because of the nature of the thing" (apparently meaning that the three men thought the operation should be kept secret). It appears from the record that D. Webber & Co. did not possess any warehouse or office and never purchased any equipment or supplies except in response to a need for same by Texam. The record further reveals that D. Webber & Co. received as income from Texam Oil Corporation during the period from July 11, 1961 through September 29, 1965 the sum of $552,311.85. It is also in the record that disbursements of profits from this operation during said period of time was the sum of $181,195.00, Cansler and Baucum each receiving profit from Webber Co. in the sum of $60,365.00, and Redline receiving $60,465.00. There is testimony from a Mr. Paul Nelson, a certified public accountant, that his examination of the records of Texam revealed other unexplained disbursements, unsupported by the records and unaccounted for as to disposition.

According to the record, in 1965 the three men had a meeting in the company offices where they discussed an extensive drilling program to be conducted by Texam on the Rocker "B" ranch in Reagan County, Texas, which would require an extensive need for drilling equipment of all types.

Apparently the three men again agreed to participate in an operation similar to that of D. Webber & Co. in order to generate a personal profit to themselves, and again the three men made financial arrangements for funds in order to purchase equipment and decided that they would operate this time under the name of "Athens Equipment Company". According to the record, the funds deposited for this new company came from the closing out of the D. Webber & Co. account, as well as a check from Texam Oil Corporation. In this new venture it appears that Cansler and Baucum determined that they had a need for billings through companies with state sales tax numbers, and Mr. Baucum stated that he was aware of the availability of such numbers; so on February 11, 1966 the billings ceased from Athens Equipment Company and commenced to flow to Texam from the multitude of approximately 26 or more new companies, all with different names. It is alleged that Texam purchased through these new companies or vehicles merchandise in the sum of $2,055,761.01. The accountant testified that he was able to trace a profit of $24,525.50 to each of the three men from the Athens operations. This certified accountant, Mr. Nelson, further testified that he was unable to account for disbursements in the sum of $457,761.30. Texam Oil Corporation introduced voluminous records including invoices, ledger cards, checks, etc., to reflect their payment.

It seems that one of the Texam Board of Directors members, a Mr. Charles C. Green, became curious about the operations of D. Webber & Co. and the Athens Equipment Company, as well as the various other vendors, and brought these matters to the attention of Mr. Cansler. It seems that Mr. Green also became curious when he noted that the postoffice box numbers of the various vendor companies were, in many cases, the same; and upon investigation Mr. Green learned that the postoffice boxes were connected with Delma Baucum. He reported this to Mr. Redline

and insisted that he be allowed to send an accountant to the offices of the company to examine the records, which was done. After this examination the Board of Directors meeting was conducted in New York City, wherein Mr. Green produced voluminous material he had gathered. Thereafter, a national accounting firm was employed to review the personal records of Mr. Cansler, Mr. Redline and Texam, pertaining to the D. Webber and Athens operations. Before this Board meeting, and as a result of a conference between the three men, they decided that they would remit to Texam the "profits" they had derived. Baucum contributed $50,000.00, and Cansler and Redline each contributed $15,000.00, to purchase a cashier's check from the First State Bank, Odessa, Texas, in the total sum of $80,300.00, which check was deposited in the Texam Oil Corporation account and credited to the Rocker "B" leases and distributed to the joint participants in the leases in proportion to the interests they owned therein. Appellee points out in its brief that the transactions by and between Texam and the so-called vendors were well documented by Exhibits 547 through 2834.

In addition to these matters, in 1961 and 1962 the three men, Redline, Baucum and Cansler, formed a corporation called "Maljamar, Inc." Cansler was President; Baucum, Vice President; and Redline, Secretary-treasurer. According to the record, in addition to performing well servicing activities for Texam, this new corporation also acquired interests in oil and gas leases and developed same in Texas and New Mexico. When the corporation was dissolved, some of its equipment was sold at a profit to Texam. The assets were assigned one-third each to Redline, Baucum and Cansler. It is in the record that in addition to the oil and gas interests obtained by the officers, in competition with Texam, this operation produced income to the three men in the sum of $50,385.73. These three men also created another oil operation known as "Redelcan". This new operation involved development and drilling of leases in the State of New Mexico, and the monies to develop these properties was borrowed from the First State Bank, Odessa, Texas.

In December, 1965, Baucum and Redline had a discussion in the Texam offices with regard to the purchase of a drilling rig to conduct the drilling of some 36 wells on the Rocker "B" leases in Reagan County. The Board of Directors of Texam rejected this idea of purchasing the rig and equipment, and informed Mr. Redline that he should not get involved. Thereafter, Redline, Baucum and Cansler decided they would purchase the rig, and a Mr. J. C. Mansker, a friend of Baucum's, was brought into the picture. It was agreed that Mansker would borrow the funds to purchase the rig from the First State Bank of Odessa, and Baucum and Cansler would guarantee the debt. The rig was purchased at a total cost of $130,000.00 with money loaned by the bank. Thereafter, bids for drilling the wells for Texam were submitted by Mansker and accepted by Redline for Texam. The actual drilling contracts were signed by Baucum and the wells were subsequently drilled pursuant thereto. It was agreed that Mansker would be paid a salary of $1,000.00 per month to operate the rig and, after the drilling of each well, $2,000.00 profit would be applied to the note at the bank, and the remainder of the profit divided equally between Mansker, Redline, Baucum and Cansler. Funds as the result of this operation were disbursed in the sum of $7,000.00 to each man. The record shows that Texam paid to Mansker Drilling Company, during the year 1966, the sum of $350,000.00.

The record also reveals that two different men—Mr. C. H. Brockett and a Mr. Marvis Simpson—sold used equipment to Baucum by invoicing them under some of the various corporations that the three men had set up. Mr. Simpson testified that Baucum would inform him as to the name of the company to which he wanted the invoice made.

The above seems to be, generally, the transactions alleged by Texam to have been entered into by Baucum et al. While our prior statement of the nature of the case and the facts and record may seem a little long, we deem it necessary to present the entire picture, as cases of this nature depend on the discretion of the trial judge and whether or not he should have issued the temporary injunction, and if same was proper and applicable. It is our belief and holding, after studying the entire case, that the trial court was well within his discretion in granting the temporary injunction. As appears from the briefs and record, the temporary injunction herein complained of was issued by the District Court of Midland County, Texas pending final hearing of a lawsuit filed by appellee (plaintiff) Texam Oil Corporation. In this lawsuit appellee charges appellant (defendant) wrongfully and fraudulently caused appellee to pay him large sums of money and otherwise obtained, retained and partially diverted and disposed of corporation funds by interposing himself for personal profit between Texam and the true vendors of various oilfield materials, supplies and services. Appellee then alleges that the funds thus; fraudulently received were used to purchase lands, oil and gas and mineral leasehold estates, stocks, bonds, stock certificates, promissory notes and other monies, assets and properties which were and are held by appellant as trustee for appellee, the rightful owner. Appellee then further alleged that it would suffer irreparable harm unless the defendants at the trial court were enjoined and restrained from disposing of the res of the alleged constructive trust. After the temporary restraining order was granted there was a hearing comprising several days, and the writ of temporary injunction was issued.

Appellant's first six points allege that there is no evidence, or there is insufficient evidence, that any of the funds alleged to be subject to the constructive trust have been traced to any property, general or specific, now owned by appellant, and that there is no evidence, or insufficient evidence, identifying the res of the alleged constructive trust; and that there is no evidence, or insufficient evidence, to create the imposition of a constructive trust upon any stocks, bonds, stock certificates, promissory notes, or any other monies, assets or properties held by appellant Delma Baucum, First State Bank of Odessa, Texas, or H. Hentz & Co.

 We do not see merit in these points, as we do not believe the law to be that a plaintiff in a case such as this should be put to the duty of accurately tracing items such as money that has been comingled with other assets or perhaps used to purchase other properties or assets. We believe the law to be, when the petition alleges a cause of action and the evidence adduced tends to sustain it, that the trial court has broad discretion granted it in matters of this nature, and may issue a temporary injunction. As indicated by the record in this case, defendant Baucum had many and varied assets and properties, and we think the trial court was well within its discretion in holding such a status quo, as our examination of the record clearly indicates that the evidence tends to sustain the allegations of the appellee in its petition and its application for temporary restraining order. We think the legal aspect of the matter is thoroughly and sufficiently discussed in the following quotation from Transport Co. of Texas v. Robertson Transports, 152 Tex. 551, 261 S.W.2d 549, decided by the Supreme Court of Texas in 1953:

> "In a hearing on an application for a temporary injunction the only question before the court is the right of the applicant to a preservation of the status quo of the subject matter of the suit pending a final trial of the case on its merits. James v. E. Weinstein & Sons, Tex.Com. App., 12 S.W.2d 959, 960. To warrant the issuance of the writ, the applicant need only show a probable right and a probable injury; he is not required to establish that he will finally prevail in the litigation. Rosenfield v. Seifert, Tex.

Civ.App., 270 S.W. 220, 223; Nagy v. Bennett, Tex.Civ.App., 24 S.W.2d 778, 781; High on Injunctions, 4th Edition, Vol. 1, Sec. 5, p. 8. If the party enjoined prevails on a final ·trial of the case he finds protection against the improvident granting of the writ and consequent loss in the interim in the applicant's bond. Where the pleadings and the evidence present a case of probable right and probable injury, the trial court is clothed with broad discretion in determining whether to issue the writ and its order will be reversed only on a showing of a clear abuse of discretion. Texas Foundries v. International Moulders & Foundry Workers' Union, 151 Tex. 239, 248 S.W. 2d 460, 462. There is no abuse of discretion in the issuance of a writ if the petition alleges a cause of action and the evidence adduced tends to sustain it. Southwestern Greyhound Lines, Inc. v. Railroad Commission, 128 Tex. 560, 99 S.W.2d 263, 109 A.L.R. 1235."

■ Appellee urges that Baucum diverted at least $130,512.97, and that by the use of such funds he acquired lands, stocks, bonds, and interests in oil, gas and mineral estates, all in violation of his trust and confidential fiduciary capacity, and that subsequent to July, 1966 he had set upon a course of conduct to dispose of properties he held and had committed acts respecting the subject of the pending litigation which would render a judgment upon the merits ineffectual. Appellant apparently does not discuss or cite the facts adduced at the trial, and it is in the record that Mr. Baucum took advantage of the provisions of the Fifth Amendment to the United States Constitution. Therefore we feel that the trial court was well within its discretionary powers in granting the temporary injunction. The Texas Supreme Court further discussed the duties of corporate officers and their fiduciary capacities in the case of International Bankers Life Ins. Co. v. Holloway, 368 S.W.2d 567, wherein it pointed out that in matters of this type the burden is cast upon the defendant to prove the fairness of his personal profits and pointing up, further, that defendants in such fiduciary capacities owe the duty of obtaining property for the corporations of which they are the officials at the best possible price; also stating that the profit which defendant corporate officers seek to make for themselves through the corporation must be held to belong to the corporation.

Having discussed the fiduciary obligations and duties of Baucum and appellant's argument that appellee should have traced the res of the trust, we will now proceed to the general consideration of the temporary injunction itself.

■ As stated in Southwest Weather Research, Inc. v. Jones, 160 Tex. 104, 327 S.W.2d 417, 421, temporary injunctions undoubtedly place petitioners in an unfavorable economic position, but our system of procedure is such that legal rights are not finally determined on the wisdom or expediency of issuing a status quo order. Our Supreme Court goes on to state that deliberate action is essential for the accurate determination of legal rights, and upon occasion such can only be accomplished by protecting a status quo; and the hearing on such is not a decision, or intended to be a decision, on the merits of the case. In Article 4642, Vernon's Ann. Civ.St., it is stated that writs of injunction may be issued where a party performs some act respecting the subject of pending litigation or threatens or is about to do such act, or to have it done for him, in violation of the rights of the applicant, when such act would tend to render the eventual judgment ineffectual. The subject of temporary injunctions is well set out and discussed in Thomas v. Allis, Tex.Civ.App., 389 S.W.2d 109 and cases cited therein. The cited case points up and emphasizes that it is not enough that there is some remedy at law, but that such remedy must be plain, adequate, or as practical and efficient to the ends of justice and its prompt administration as the remedy at equity. In other words this case, and the many cases cited

therein, point up that the remedy at law must be practical, available and effectual. As stated in Moffitt v. Lloyd, Tex.Civ.App., 98 S.W.2d 860 (n. w. h.), the primary purpose and office of the temporary injunction is to preserve the status quo of the subject matter of the suit against any act of a party which would tend to render the final judgment in the case ineffectual. Also, the Supreme Court of Texas, in the case of City of Dallas v. Wright, 120 Tex. 190, 36 S.W.2d 973, 77 A.L.R. 709, speaking through the then Chief Justice Cureton, stated that it is elementary that a court, once having obtained jurisdiction of a cause of action as incidental to its general jurisdiction, may exercise any power or grant any writ, including the writ of injunction, necessary to administer justice between the parties, preserve the subject matter of the litigation, and make its judgment effective. Other decisions point out that in case of trust funds (and we deem the language equally applicable to constructive trust funds or properties), such do not belong to the petitioner or defendant, but must await the disposition of the case on its merits; and if the defendant is successful, then his ownership is determined and assured, and if not, the property wrongfully obtained and fraudulently held may be returned to the rightful owners. Therefore, on the basis of the record, pleadings and testimony, we think the trial court was within its power in granting the temporary injunction in the manner and at the time it did. The very nature of the factual background here, in our opinion, requires the holding of these assets of Mr. Baucum in status quo until the entire matter can be deliberately disposed of in a trial on the merits. Appellant's Points 1 through 6 are therefore overruled.

■ Appellant's Points 7, 8 and 9 take the position that the trial court abused its discretion because the injunction as issued is so ambiguous, vague and unclear that appellant is not fully apprised of what he is prohibited from doing so that he can comply with said injunction, and the force and effect of said injunction is wholly conjectural and speculative. We do not find merit in these points. The intent of the court is clearly set forth in its own language, wherein it is stated that if defendant Delma Baucum is not restrained from disposing of property which may become the res of a constructive trust, a final judgment in the cause could be rendered ineffectual and the plaintiff will suffer irreparable damage thereby unless the said defendant is restrained from disposing of the property now held in his name. We think the injunction is clear and adequate, and in view of Mr. Baucum's silence the court had to go on what information it had and, therefore, within his discretion, decreed that the properties, monies and assets of the defendant Baucum should be held in status quo until the matter could be thoroughly sorted out in a trial on the merits. Points 7, 8 and 9 are according overruled.

Appellant's Points 10, 11 and 12 argue that the injunction has the effect of destroying the status quo or, in the alternative, of accomplishing the whole purpose of the suit, and further that appellee has brought forth no evidence, or insufficient evidence, tending to show what the status quo was before the suit was instituted. We do not find merit in these points and believe them to have been covered by our prior discussions. It must be remembered that plaintiff's pleadings and briefs and the record indicate that Mr. Baucum personally profited at the expense of the corporation of which he was vice president, by buying properties and services through dummy corporations and then selling them to his own company at a profit to himself and his two companions. It would be no easier or practical or necessary for the court to determine what the status quo was before than it would have been for the court to have made the injunction as pin-pointedly accurate as defendant demands. Under the circumstances, where there was evidence adduced to show that Mr. Baucum had improperly profited at his corporation's expense and had converted at least some of the money so improperly obtained into other types of

property and, as alleged in appellee's brief, was making efforts to dispose of some of these properties, we think the injunction was properly granted and is proper and adequate in form. Appellant's Points 10, 11 and 12 are therefore overruled.

■ Appellant's Points 13 and 14 maintain that the trial court abused its discretion in granting the writ of temporary injunction because such writ infringes upon the rights of the appellant under the Constitution of the State of Texas. It has long been decided that homestead and exemption laws of this State were never intended to be, and cannot be, the haven of wrongfully obtained money or properties. As stated in the case of First State Bank v. Zelesky, Tex.Civ.App., 262 S.W. 190, the property wrongfully obtained never belonged to the individual anyway. We do not find any merit in Points 13 and 14. Bush v. Gaffney, Tex.Civ.App., 84 S.W.2d 759 (n. w. h.); Smith v. Green, Tex.Civ.App., 243 S.W. 1006 (err.ref.); Meyers v. Baylor University in Waco, Tex.Civ.App., 6 S.W.2d 393 (ref.). Appellee again points out that if the injunction does have harsh economic results to appellant, such is the result of his commission of fraudulent acts and his refusal to proffer evidence regarding his property and affairs. We believe the above cases and others point out that funds wrongfully diverted from a corporation and subsequently diverted into property ordinarily exempt, will be subject to a constructive trust, and a trial court has wide discretion in holding the entire matter in status quo until a trial on the merits can be had. Therefore, Points 13 and 14 are overruled.

■ Appellant's Points 15 through 18 maintain that appellee has failed to prove that the available remedies at law were inadequate, and has failed to present sufficient evidence that appellee would suffer irreparable injury if the temporary injunction were not issued; that appellee has not shown that it has attempted to exhaust its remedies at law, and lastly, that the writ is not supported by sufficient definiteness and certainty in the pleadings and alleges that the pleadings assert only conclusions, and not facts. We think these points must all be overruled and feel that they have been disposed of in our prior discussions and holdings. However, we should like to point again that the question of the adequacy of the remedies is one for the judge, clothing him with wide discretion in passing on same. It is not a jury question. Further, the mere fact that there exists a remedy at law is not conclusive, but the remedy at law must be complete, practical and efficient, and subject to prompt administration. This means, of course, that equity will step in with its injunctive processes where the remedy at law may not be sufficient or effective. This is clearly stated by the Supreme Court in Brazos R. Conservation & Reclamation Dist. v. Allen, 141 Tex. 208, 171 S.W.2d 842, wherein our Supreme Court again cites cases recognizing the settled principle that the injured party is entitled to relief by injunction where there is not clear, full and adequate relief at law. The Supreme Court cites many authorities with respect to this statement and then says: "It is not enough that there is a remedy at law; it must be plain and adequate, or, in other words, as practical and efficient to the ends of justice and its prompt administration as the remedy in equity."

Without further discussion, we think it is clear that the trial court was well within its discretion in issuing the temporary injunction and attempting to maintain the status quo. We hold that there was adequate proof adduced to justify the trial court in issuing the writ, and we further hold that the temporary injunction is sufficiently clear and adequate and legally acceptable.

We have examined the many cases cited by the appellant, but we do not find that

these cases contradict our holdings as set forth above.

Appellant's points are all overruled, and the decision of the trial court is in all things affirmed.