

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-18-00107-CV

_____

THE GOOD SHEPHERD HOSPITAL, INC. D/B/A CHRISTUS GOOD SHEPHERD
MEDICAL CENTER LONGVIEW, Appellant

V.

SELECT SPECIALTY HOSPITAL - LONGVIEW, INC., Appellee

On Appeal from the 71st District Court
Harrison County, Texas
Trial Court No. 18-0718

Before Morriss, C.J., Burgess and Carter,* JJ.
Memorandum Opinion by Justice Carter

_____

*Jack Carter, Justice, Retired, Sitting by Assignment

# MEMORANDUM OPINION

This is an interlocutory appeal from a trial court's order granting a temporary injunction. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(4) (West Supp. 2018). The temporary injunction requires appellant, Good Shepherd Hospital d/b/a Christus Good Shepherd Medical Center Longview (Good Shepherd), to continue providing services to Select Specialty Hospital-Longview, Inc. (Select), and its patients pursuant to a service contract terminated by Good Shepherd. On appeal, Good Shepherd argues that the trial court abused its discretion in granting injunctive relief because Select did not establish a probable right to recovery since the service contract was properly terminated in accordance with its express provisions.

We conclude that Good Shepherd's appeal seeks an advisory opinion from this Court. Because we decline to issue an opinion amounting to an advance ruling on the merits of the case, we affirm the trial court's judgment.

## I. Factual and Procedural History

### A. The Lease Agreement

Select owns and operates a long-term care facility for patients discharged from intensive care units who require an average future hospitalization of at least twenty-five days. In 2002, Good Shepherd, as Lessor, entered into a lease agreement (Lease) with Select's predecessor. As a result of this Lease, Select's long-term health care facility is housed on the first two floors of Good Shepherd Hospital, which is an acute care facility.[1]

---

[1]The Lease provides the following express warranty of quiet possession:

2

The Lease of Good Shepherd's property was initially for a five-year term, with an option to "extend the term . . . for two (2) additional consecutive five-year renewal terms." As a result of amendments to the Lease extending its terms, the Lease is effective through June 30, 2023, and provides that the relationship between Good Shepherd and Select "at all times shall remain solely that of Lessor and Lessee and shall not be deemed to constitute a partnership or joint venture." It also states, "Lessee and Lessor may enter into ancillary agreements for the provision of [various] services."

## B. The Ancillary Agreement

On the same day that the Lease was originally signed, Good Shepherd entered into an Ancillary and Support Services Agreement (Ancillary Agreement) with Select's predecessor, which required it to provide dietary services, radiology/imaging services, laboratory and pathology services, blood banking services, surgery services, laundry and linen services, emergency response services, biomedical equipment maintenance and repair services, transcription services, and other

---

Quiet Possession. Lessor shall, on the Commencement Date as hereinabove set forth, place Lessee in quiet possession of the Leased Premises and shall secure Lessee in the quiet possession thereof against all persons claiming the same during the entire Lease term and each extension thereof. Lessor agrees to make reasonable efforts to protect Lessee from interference or disturbance by third persons, including other tenants in the Hospital.

It also contains what Select refers to as a non-competition provision, which states:

No Other [Long-Term Acute Care Facility]-Lessor. Lessor agrees that Lessor shall not own, participate in, manage, develop or operate any other long-term acute care hospital in the Hospital or within an affiliate hospital located within 25 miles of the [long-term acute care facility] during the term of this Lease. In the event that this Lease is terminated without cause by Lessor, or not renewed by Lessor following the expiration of any term of this Lease, then Lessor agrees not to own, participate in, manage, develop or operate [a long-term acute care facility] in affiliation with any third party for a period of two (2) years following the termination date of this Lease.

3

additional purchased services. It also clarified, "The parties agree that [Good Shepherd] is an independent contractor and is not an agent or representative of [Select]. Nothing contained herein is intended, nor shall it be construed or deemed, to make [Good Shepherd] and [Select] partners or joint venturers." The fees for the provision of the services were included in the Ancillary Agreement, in detail.

While the Ancillary Agreement provided for circumstances under which the parties could terminate the agreement without affecting the Lease, the Lease's termination also constituted termination of the Ancillary Agreement. The Ancillary Agreement further stated,

> If the term of the Lease is extended beyond its initial term, this Agreement shall be automatically extended for the same length of time, unless either party hereto gives notice of termination to the other party not later than one hundred eighty (180) days prior to the expiration date of the then current term of the Lease.

It is undisputed that the Lease has not been terminated and is still in full force and effect.[2]

### C.      The Purchased Services Agreement

On December 18, 2012, Good Shepherd entered into a Purchased Services Agreement (PSA) with Select after renegotiating the provision of and rates of certain services. In addition to the services which had previously been provided under the Ancillary Agreement, Good Shepherd

---

[2]We previously remanded the appeal to the trial court for further proceedings after declaring void and dissolving the temporary injunction. *Good Shepherd Hosp., Inc. v. Select Specialty Hosp. - Longview, Inc.*, 563 S.W.3d 923, 927 (Tex. App.—Texarkana 2018, no pet.). Our opinion was based solely on the fact that the trial court's order was not specific enough to comply with Rule 683 of the Texas Rules of Civil Procedure. Following remand, Select sought to introduce evidence showing that, after the Lease had been twice extended, on April 4, 2012, Good Shepherd provided at least 180 days' written notice to Select of its desire to modify both the Lease and Ancillary Agreement. The letter also stated that, pursuant to the terms of the Lease and Ancillary Agreement, Good Shepherd was providing "notice that the existing lease and support services agreement [would] not be renewed at the end of the existing term." Declining to reopen the evidence already presented at the temporary injunction hearing, the trial court sustained Select's objection to this letter. Because it is unnecessary to our disposition in this case, we need not address Good Shepherd's argument that the trial court erred in excluding this evidence on remand.

4

agreed to provide "additional services, such as hyperbaric therapy and wound care services, biomedical engineering services and maintenance repairs, and annual preventative maintenance services."[3] The PSA defined the term "services" as "the services provided by [Good Shepherd] to [Select] pursuant to this Agreement . . . including ancillary and other clinical services as specified in this Agreement." It also specified that the PSA "constitute[d] the entire Agreement between the parties with respect to the subject matter hereof, and supersede[d] any and all other agreements, understanding, negotiations, or representations, oral or written, between them." The PSA defined Select as the "Hospital" and Good Shepherd as "Contractor" and contained the following relevant provisions:

> 7.     TERM AND TERMINATION OF THIS AGREEMENT
>
>     7.1     Term.   This Agreement shall be effective as of November 26, 2012[,] and shall thereafter coincide with the term of the Lease.
>
>     7.2     Termination.  This Agreement may be sooner terminated on the first to occur of the following:  . . . .
>
>     7.2.5     Termination Without Cause. Either party may terminate this Agreement at anytime upon ninety (90) days written notice to the other party . . . .
>
>     7.2.6     Effects of Termination. Upon termination of this Agreement, as hereinabove provided, neither party shall have any further obligation hereunder except for obligations accruing prior to the date of termination.

While Good Shepherd provided ancillary services to Select under the PSA, the terms of the PSA specified that Select was "solely responsible for the determination, the planning and the implementation of treatment" for its patients.

---

[3]The PSA also listed a charge for "Laboratory and Blood Bank Services."

### D.    The Lawsuit

In 2017, Good Shepherd requested a meeting with Brian E. Davis, the president of Select's Long-Term Acute Care Hospital Division, for the purposes of discussing whether Select would consider giving up its remaining term on the Lease in exchange for economic remuneration. Select declined the offer. On April 27, 2018, Good Shepherd notified Select, in writing, that, invoking Section 7.2.5, it was terminating the PSA after "evaluating [its] strategic plans" and that the effective date of the termination was July 31, 2018. On June 25, 2018, Good Shephard wrote to Select to clarify that it was terminating only the PSA and that it had "at no time . . . stated or implied that it would not comply with [the Lease's] terms and conditions." Further, Good Shepherd "request[ed] a meeting with the appropriate Select staff to discuss the orderly transition of services to the new provider" and assured that Good Shepherd would "not allow patient care to be compromised, including the provision of Code Coverage." Good Shepherd's letter recited that Select "assured [Good Shepherd] that it would not have any difficulty in locating alternative service providers," stated it "underst[ood] that Select [wa]s in discussions with numerous new services providers, including Longview Regional Medical Center and Diagnostic Clinic of Longview, both of which can provide Code Coverage," and added that it would be "more than willing to discuss a reasonable extension of the termination date to ensure that patient care is not adversely affected in any way."

However, Select sued Good Shepherd on the same day the June 25 letter was received for, among other things, breach and anticipatory breach of the Lease, Ancillary Agreement, and PSA. Select also sought declaratory judgment regarding its rights and status under these agreements and

6

asked the trial court for a temporary injunction to preserve the status quo as it existed prior to Good Shepherd's termination of the PSA. Good Shepherd responded that the Lease did not require it to provide any services, that the Ancillary Agreement was "no longer in effect and was superseded by the PSA," and that it properly terminated the PSA by providing written notice in a timely manner.

At the temporary injunction hearing, Andrew M. Meade, Select's chief executive officer, testified that (1) Good Shepherd had never terminated the Lease, (2) the Lease did not require Good Shepherd to provide Select with ancillary services, and (3) Good Shepherd provided ninety days written notice of the PSA's termination.

Nevertheless, Meade focused on the impact resulting from the PSA's termination. He testified that Select's patients would have to be transferred by ambulance to another acute care hospital to receive many of the services Good Shepherd was terminating. Brenda Vozza, Select's medical director, testified that transporting Select's patients by ambulance to the nearest facility could be life-threatening. She added that it was not feasible to continue to operate without the services provided by Good Shepherd.[4]

On the issue of irreparable harm, Meade testified that Select operated twenty-six free-standing long-term care facilities across the country and that it was possible to operate the facility without being attached to an acute care hospital. According to Meade, Select had $122 million in cash and was in discussions with other service providers. Meade further testified that Select was

---

[4]Vozza testified that Select's facility had a total capacity of thirty-two beds, that it was currently treating twenty-four patients, and that, because the average stay was approximately twenty-five days, Select could transition the patients out of its facility.

7

negotiating with Longview Regional Medical Center, located two and one-half miles away, to provide the services previously provided by Good Shepherd and that their conversations with Longview Regional Medical Center were progressing toward a deal. He agreed that Good Shepherd said it would work with Select to facilitate a smooth transition of patient care.

On July 2, 2018, seven days after Select's petition was filed, the trial court granted its request for a temporary injunction. Following our remand, on November 5, 2018, the trial court granted Select's request for a temporary injunction after finding that Select had shown a probable right to relief at trial on its breach of contract, anticipatory breach of contract, and breach of express warranty of quiet enjoyment claims. To support its ruling, the trial court found that the Lease, Ancillary Agreement, and PSA ran together because their intended purpose was for Select to operate its long-term acute care hospital within Good Shepherd.[5] It concluded that the PSA was designed only to supplement the Ancillary Agreement, to expand services, and to alter the pricing of those services. Thus, the trial court concluded that all of the agreements were to terminate when the Lease terminated on June 30, 2023.

The trial court further found that "Select ha[d] shown that Select, and Select's patients [would] suffer a probable, imminent, and irreparable injury before trial if this temporary injunction

---

[5]The trial court wrote:

> The parties' intent in executing each of the Agreements was that [Good Shepherd] provide those critical medical and other services throughout the duration of the Lease because Select had no use for the Lease Agreement except to operate a [long-term acute care hospital], and Select could not safely operate the [long-term acute care hospital] within the Leased Premises without the support of [Good Shepherd] through the provision of these critical medical and other services.

8

is not issued" because Good Shepherd "has threatened to discontinue certain . . . life-saving healthcare-related services," which could compromise patient care and impact Select's goodwill. Accordingly, the trial court ordered Good Shepherd and its "agents, servants, and employees, and those acting in concert with it," to refrain from the following:

a.      refusing to provide Plaintiff and its patients any and all services that Defendant currently provides to them pursuant to the Lease, the PSA, the Ancillary Agreement, or any other agreements, understanding, or protocol in place between Plaintiff and Defendant;

b.      terminating the Lease or any agreement ancillary thereto, including the PSA and Ancillary Agreement;

c.      interfering with Plaintiff[']s right to quiet possession of the Leased Premises and the common areas of Defendant [Good Shepherd's] hospital;

d.      materially changing the referral process and inhibiting the proper referral of patients to the Select [long-term acute care hospital];

e.      restricting Plaintiff[']s access to patient information for patients referred to the Select [long-term acute care hospital]; and

f.      refusing services to any of Plaintiff[']s patients that would materially compromise a patient's health and wellbeing.

The temporary injunction set the matter for trial on June 17, 2019, and stated that Select had paid a bond of $1,000.00.

## II.      Good Shepherd's Appeal Seeks an Advance Ruling on the Merits

On appeal, Good Shepherd argues that a de novo review of the trial court's apparent construction of the Lease, Ancillary Agreement, and PSA requires reversal of its temporary injunction. Specifically, Good Shepherd contends that a plain reading of these contracts compels the conclusions (1) that the Lease does not require Good Shepherd to provide any ancillary

9

services, (2) that the terms of the PSA specify that the Ancillary Agreement was superseded by the PSA, (3) that the PSA provided for termination without cause on ninety days' written notice, and (4) that Select, therefore, cannot maintain any cause of action against Good Shepherd. Its briefing makes clear that it "requests the Court to decide the key legal issues in this case." In addition to responding to Good Shepherd's arguments on the merits, Select argues that Good Shepherd impermissibly seeks an advance ruling on the merits. We agree.

"The purpose of a temporary injunction is to preserve the status quo pending a trial on the merits." *Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 759 (Tex. App.—Texarkana 2017, pet. dism'd). "Generally, the status quo is 'the last, actual, peaceable, non-contested status that preceded the pending controversy.'" *Id.* (quoting *State v. Sw. Bell Tel. Co.*, 526 S.W.2d 526, 528 (Tex. 1975)). "A temporary injunction maintains the status quo by preventing 'any act of a party which would tend to render the final judgment in the case ineffectual.'" *Id.* (quoting *Baucum v. Texam Oil Corp.*, 423 S.W.2d 434, 441 (Tex. Civ. App.—El Paso 1967, writ ref'd n.r.e.)). "To be entitled to a temporary injunction, the applicant must plead and prove '(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.'" *Id.* (quoting *Townson v. Liming*, No. 06-10-00027-CV, 2010 WL 2767984, at *2 (Tex. App.—Texarkana July 14, 2010, no pet.) (mem. op.)).

Good Shepherd argues that the standards of review for a temporary injunction essentially allow this Court to render a decision barring Select's causes of action based on our construction of the Lease, Ancillary Agreement, and PSA. It is true that a "review of the trial court's granting of a temporary injunction is limited to determining whether the trial court clearly abused its

10

discretion," "[a] trial court has no 'discretion' in determining what the law is," and "[w]e review questions of law without deference to a lower court's conclusion." *Id.* (citing *Gannon v. Payne*, 706 S.W.2d 304, 305 (Tex. 1986); *Bay Fin. Savs. Bank, FSB v. Brown*, 142 S.W.3d 586, 589 (Tex. App.—Texarkana 2004, no pet.)); *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992); *Props., Inc. v. Breton*, 447 S.W.3d 558, 562 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Because "a temporary injunction will be dissolved if it is based upon an erroneous application of the law to the facts," in most cases, reviewing a trial court's legal conclusion on appeal from a temporary injunction does not constitute an advisory opinion. *Dallas Gen. Drivers, Warehousemen & Helpers v. Wamix, Inc., of Dallas*, 295 S.W.2d 873, 879 (Tex. 1956).[6]

Although contract construction of an unambiguous contract is a question of law, we may not decide the merits of the dispute because "the ruling on a temporary injunction is not a ruling on the merits." *Senter Invs., L.L.C. v. Veerjee*, 358 S.W.3d 841, 847 (Tex. App.—Dallas 2012, no pet.); *see Brooks v. Expo Chem. Co.*, 576 S.W.2d 369, 370 (Tex. 1979) (citing *Davis v. Huey*, 571 S.W.2d 859, 861 (Tex. 1978)). This is because

> our system of procedure is such that legal rights cannot be finally determined upon a hearing relating to the wisdom or expediency of issuing a status quo order. Deliberate action is essential for the accurate determination of legal rights and upon occasion this can be secured only by issuing a temporary decree protecting a status quo.

---

[6]We note that a majority of Good Shepherd's cited cases include the erroneous application of the Constitution, statutes, legal principles, or defined rules to the facts. *See Dallas Gen. Drivers, Warehousemen & Helpers*, 295 S.W.2d at 879; *Gannon*, 706 S.W.2d at 306–07; *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 207 (Tex. 1981); *Tex. Ass'n of Bus. v. City of Austin, Tex.*, 565 S.W.3d 425, 438 (Tex. App.—Austin 2018, pet. filed). By urging that the contracts are "the law" in this case, Good Shepherd argues that the temporary injunction should be reversed because the trial court misconstrued the contracts. As further explained in this opinion, the construction of the contracts, as opposed to other laws, legal principles, or rules, involve the ultimate question of the parties' intent, which the trial court has yet to finally determine. In other words, the trial court has not yet decided what "the law" is at this point, and neither will we.

*Tom James of Dallas, Inc. v. Cobb*, 109 S.W.3d 877, 884 (Tex. App.—Dallas 2003, no pet.) (quoting *Sw. Weather Research, Inc. v. Jones*, 327 S.W.2d 417, 421–22 (Tex. 1959)). Additionally, we cannot "assume that the evidence taken at the preliminary hearing will necessarily be the same as the evidence developed at [a summary judgment hearing or] a full trial on the merits." *Birds Const., Inc. v. Gonzalez*, 595 S.W.2d 926, 929 (Tex. App.—Corpus Christi 1981, no pet.). Likewise, "the expression 'probable right to recover' is a term of art; it does not imply any kind of determination that becomes the law of the case." *183/620 Grp. Joint Venture v. SPF Joint Venture*, 765 S.W.2d 901, 904 (Tex. App.—Austin 1989, writ dism'd w.o.j.).[7]

Thus, "[o]ur review of the trial court's decision is limited to the validity of its temporary injunction order; we do not consider the merit of the underlying case." *Tex. Black Iron, Inc. v. Arawak Energy Int'l Ltd.*, 527 S.W.3d 579, 585 (Tex. App.—Houston [14th Dist.] 2017, no pet.). Accordingly, "[a] party may not use an appeal of a temporary injunction ruling to get an advance ruling on the merits." *Dallas/Fort Worth Int'l Airport Bd. v. Ass'n of Taxicab Operators, USA*, 335 S.W.3d 361, 365 (Tex. App.—Dallas 2010, no pet.) (citing *Hiss v. Great N.*

---

[7]In *183/620 Group Joint Venture*, landowners sued project managers who were paid large sums of money to improve the landowner's properties after the project managers allegedly failed to properly manage the construction projects. *183/620 Grp. Joint Venture*, 765 S.W.2d. at 902. When the landowners learned that the project managers were paying their defense fees from the pool of money the landowners had given them to complete the projects, the landowners sought and were granted a temporary injunction requiring the project managers to refrain from expending further sums on the project or from using the pool of money to defend the lawsuit. *Id.* at 902–03. On appeal, the project managers argued that several provisions in the contracts expressly authorized their expenditure of funds in defense of the lawsuit and, therefore, the trial court erred in determining that the landowners had a probable right of recovery regarding these expenditures. *Id.* at 904. Finding the contract provisions too general to constitute an express grant of authority to expend funds in defense of the suit, the Austin court simply left the contract construction issue for the trial court "after a final hearing as to the intent of the parties." *Id.* It wrote, "The sums are so large, and the interests at stake so important, that the parties' rights should not be determined until they can be determined accurately." *Id.*

12

*Am. Cos.*, 871 S.W.2d 218, 219 (Tex. App.—Dallas 1993, no writ)); *see Recon Expl., Inc. v. Hodges*, 798 S.W.2d 848, 853 (Tex. App.—Dallas 1990, no pet.) (citing *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981)). An appeal of a temporary injunction based on the probable right of recovery ground is "problematic" for this reason. *Babu v. Zeeck*, 478 S.W.3d 852, 855 (Tex. App.—Eastland 2015, no pet.). Accordingly, several Texas courts have declined to address the propriety of an appellant's arguments on review of a temporary injunction.

We find the Austin Court of Appeals' decision in *Comed Medical System Co. v. AADCO Imaging, LLC*, instructive. There, the Austin court noted that several of Appellant's contentions ultimately sought or presumed a favorable resolution on the merits of its contract-interpretation and enforcement dispute with the Appellees. *Comed Med. Sys., Co. v. AADCO Imaging, LLC*, No. 03-14-00593-CV, 2015 WL 869456, at \*5 (Tex. App.—Austin Feb. 25, 2015, no pet.) (mem. op.). These included contentions that Appellant had properly terminated a master distribution agreement and that the trial court's order improperly resurrected the terminated master distribution agreement.[8] *Id.* Because Appellant's arguments went to the heart of the dispute, the Austin court declined to review them, notwithstanding "[t]he fact that some of these issues will turn on construction of what [Appellant] regards as unambiguous contractual language." *Id.* In deciding to overrule Appellant's arguments outright without addressing them, the court wrote, "In short, none of these arguments demonstrate any abuse of discretion by the district court in its decision to

---

[8]This is analogous to Good Shepherd's argument that it properly terminated the PSA and the trial court's temporary injunction revived it and the Ancillary Agreement.

13

preserve the status quo pending determination of the merits, as opposed to the merits themselves." *Id.* The Austin Court of Appeals summarily affirmed the trial court's temporary injunction.

In another case, the Dallas Court of Appeals declined to address Appellant's arguments on appeal from a temporary injunction which sought an advance ruling on the merits. *Dallas/Fort Worth Int'l Airport Bd., USA*, 335 S.W.3d at 366 (citing *Valley Baptist Med. Ctr. v. Gonzalez*, 33 S.W.3d 821, 822 (Tex. 2000) (per curiam)). In that case, Appellant argued that the only issue before the court was a legal issue concerning its authority to adopt and enforce its Taxicab Compressed Natural Gas Incentive Program Policy, which would grant taxicabs using compressed natural gas head-of-the-line privileges at the airport's taxicab queue. *Id.* at 363. The sole question was whether Appellant's policy complied with its grant of authority under statute or its rules and regulations to implement policies necessary to operate the airport.[9] *Id.* at 365. In rejecting Appellant's invitation to decide the legal issue, the Dallas Court of Appeals noted that there was no final judgment on the legal issue and reasoned that any opinion written by it would constitute an advisory opinion. *Id.* The court wrote, "Even if it is ultimately determined that the only issues in the underlying suit are questions of law, those questions 'can only be determined . . . after . . . a trial on the merits has been had.'" *Id.* at 366 (quoting *Transp. Co. of Tex. v. Robertson Transps., Inc.*, 261 S.W.2d 549, 553 (1953) (citations omitted)); *see Senter Invs., L.L.C.*, 358 S.W.3d at 847 n.11 (rejecting "argument that the lease is unambiguous and should be interpreted as a matter of law" because it did not "change the rule that the merits of the question are not presented in a

---

[9]In challenging whether its policy was valid, Appellants questioned what "the law" was, not the application of set law to the facts at a time when the trial court had not yet finally determined whether the policy was void.

14

temporary injunction proceeding"); *Tom James of Dallas, Inc.*, 109 S.W.3d at 883–84 (declining invitation to determine enforceability of covenants not to compete); *see also Fuentes v. Union de Pasteurizadores de Juarez Sociedad Anonima de Capital Variable*, 527 S.W.3d 492, 499 (Tex. App.—El Paso 2017, no pet.) (declining to review statute of limitations argument);[10] *Babu*, 478 S.W.3d at 855; *Layton v. Ball*, 396 S.W.3d 747, 755 (Tex. App.—Tyler 2013, no pet.); Harry M. Reasoner, *Equity—Injunctions—Practice and Procedure—Criteria for Granting A Temporary Injunction When Only Questions of Law Are Presented*, 40 TEX. L. REV. 409 (1962) (citing *Anderson v. Tall Timbers Corp.*, 347 S.W.2d 592, 594 (Tex. 1961) for the proposition that "the case must be construed as holding that the trial court had the discretion to grant a temporary injunction where a difficult question of law is involved, even though the facts are undisputed").[11]

---

[10]"[T]he date a cause of action accrues is normally a question of law." *Sw. Energy Prod. Co. v. Berry-Helfand*, 491 S.W.3d 699, 722 (Tex. 2016) (quoting *Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 623 (Tex. 2011)).

[11]We recognize that there is split of authority on this issue. For example, in *Car Wash Systems of Texas, Inc. v. Brigance*, the Fort Worth Court of Appeals reversed the trial court's decision to deny a temporary injunction. 856 S.W.2d 853, 854 (Tex. App.—Fort Worth 1993, no pet.). In doing so, the court found that the trial court erred in construing the covenant not to compete and nondisclosure provisions of an employment contract. *Id.* at 858. The opinion drew a dissent arguing that the court had impermissibly issued a ruling on the merits. *Id.* at 859 (Hill, C.J., dissenting).

The Houston Fourteenth Court of Appeals engaged in contract construction and found that the trial court misinterpreted a contract in overturning a trial court's grant of a temporary injunction. *T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass'n*, 162 S.W.3d 564, 566 (Tex. App.—Houston [14th Dist.] 2004, no pet.). There, after a developer developed nineteen subdivisions surrounding a country club, the developer sold the country club to Appellant. *Id.* at 566. The developer deeded the lake on the property to Appellees, the property owners' association, but assigned Appellant an easement right in use of the water for the lake. *Id.* While the deed to Appellant provided that it had the "duty and obligation to maintain the water at a sufficient level" so that Appellees could enjoy the lake, the assignment stated that the duty existed "so long as water suitable for these purposes [wa]s reasonably available from Trinity River Authority of Texas under terms substantially similar" to the terms contained in the water sale agreement between the developer and Trinity River Authority. *Id.* at 566–67. Appellees sued after Appellant decided to stop replenishing water from a lake it used to irrigate the country club after the Trinity River Authority hiked its rates. *Id.* at 567. The trial court issued an injunction requiring Appellant to cease using the water and required it to replenish the lake to its original level. *Id.* In deciding the case, the court addressed the merits of the underlying dispute by concluding that (1) water was not available under substantially similar terms to the ones existing when the developer granted the easement, (2) the trial court erred in construing the requirement of substantially similar terms as a covenant instead of a condition precedent, and, therefore, (3) Appellant was not obligated to replenish the water

15

The great weight of authority on this issue precludes us from rendering an advisory opinion on the merits of the case at this stage in the proceedings. Therefore, we examine Good Shepherd's complaints on appeal to determine whether they seek an improper advisory opinion on the merits. With respect to Select's probable right of recovery, Good Shepherd argues: (1) the Lease, Ancillary Agreement, and PSA do not run together; (2) Good Shepherd properly terminated the PSA under the PSA's express terms; (3) the Ancillary Agreement terminated before the PSA, or, alternatively, was superseded by the PSA; (4) Good Shepherd has no contractual duty to provide ancillary services since it terminated the PSA, and (5) Good Shepherd has not terminated the Lease. Good Shepherd's prayer asks this Court to:

> address the central legal issues in this case and hold as a matter of law that
>
> 1. The Lease and the PSA are not ambiguous.

---

in the lake. *Id.* at 571. This opinion also drew a dissent arguing that the court had impermissibly issued a ruling on the merits. *Id.* at 572 (Seymore, J., dissenting).

The Amarillo Court of Appeals addressed the merits of a contract dispute in *SHA, LLC v. Northwest Texas Healthcare System, Inc.*, No. 07-13-00320-CV, 2014 WL 31420, at *2 (Tex. App.—Amarillo Jan. 3, 2014, no pet.). In that case, a hospital agreed to provide medical services to the insurance company's clientele in return for scheduled reimbursement. *Id*. at *2. As the original term of the contract approached, the parties entered two amendments on September 1, 2009. *Id*. The first amendment stated, "This Agreement shall continue for a term of three (3) years and may not be terminated by either party except for cause" and the second amendment stated, "Both Hospital and FirstCare agree that this Agreement shall not be terminated by either party without cause, prior to August 31, 2012." *Id*. Although August 2012 passed without execution of another written agreement, the parties continued to operate as they had. *Id.* In June 2013, the insurance company notified the hospital that it would no longer reimburse for medical care given to individuals that were not in the Medicaid and CHIP program. *Id.* The hospital argued that the agreement could only be terminated for cause and sued. In interpreting the contract amendments in an "endeavor to enforce the parties' intent," the Amarillo Court of Appeals rejected the hospital's argument that the contract could only be terminated for cause after August 2012, since such an interpretation would effectively create a perpetual contract. *Id.* at *2–3. The court determined that the parties' continued operation under the expired contract constituted a contract terminable at will by either party. *Id.* at *3. In vacating the injunction, the merits of the dispute were essentially resolved. There was no discussion regarding caselaw prohibiting a merits decision on appeal from a temporary injunction.

16

2. The Lease does not require Good Shepherd to provide any of the medical services in question to Select.

3. The 2002 Agreement terminated in 2012, either by its own terms or by the parties' execution of the PSA, and thereafter had no effect.

4. Good Shepherd properly terminated the PSA effective July 31, 2018.

5. Good Shepherd's termination of the PSA had no effect on the Lease.

6. Good Shepherd has no liability to Select based upon or resulting from Good Shepherd's termination of the PSA.

7. Good Shepherd has no duty to provide the medical services in question to Select after July 31, 2018, and has no liability for not providing such medical services after July 31, 2018. [12]

In essence, Good Shepherd seeks a conclusion that it did not breach any contract.

In issuing its temporary injunction, the trial court entered a status quo order, not a final judgment on the merits of the legal dispute before it. *See Dallas/Fort Worth Int'l Airport Bd.*, 335 S.W.3d at 365 ("However we dispose of this appeal, the trial court will still have to resolve the case on the merits and render a final judgment, which will be subject to appeal. Therefore, any determination we may make as to the issues presented by the Airport Board in this appeal would be advisory."). Given our prohibition on advisory opinions, we decline Good Shepherd's invitation to enter one and, therefore, overrule its points of error on appeal.

---

[12]In response, Select argues that the trial court did not abuse its discretion in determining that it had a probable right to recovery because it established a bona fide dispute that the Lease and Ancillary Agreement were intended to and do run together, that the Ancillary Agreement ran concurrent with the Lease, that the PSA could not supersede the Lease because it omits critical operating arrangements contained only in the Ancillary Agreement, and that Good Shepherd breached the covenant of quiet enjoyment and the noncompetition provisions of the Lease.

17

## III. Conclusion

We affirm the trial court's temporary injunction and note that "the fastest way to cure any hardship from a preliminary order is to proceed expeditiously to a full consideration of the merits of the dispute." *Comed Med. Sys., Co.*, 2015 WL 869456, at \*6 (quoting *Senter Invs.*, 358 S.W.3d at 847–48).


Jack Carter
Justice


Date Submitted:     April 17, 2019
Date Decided:       May 3, 2019

18